776 A.2d 570 (2001)
In re L.D.H., J.P.S., Appellant.
No. 99-FS-797.
District of Columbia Court of Appeals.
Argued May 17, 2001.
Decided May 24, 2001.[*]
*571 Carla S. Rappaport, appointed by the court, for appellant.
Sheila Kaplan, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.
Before SCHWELB and REID, Associate Judges, and NEBEKER, Senior Judge.
PER CURIAM.
Appellant J.P.S., the biological father of L.D.H., who has been adjudged a neglected child under D.C.Code § 16-2301(9)(A) and (B) (March 2001 Supp.), challenges that portion of the order finding that he abused the child. He also appeals from the disposition order which prohibits him from visiting the child "until [the] therapist advises otherwise or there is [a] further order of the court." We affirm.

FACTUAL SUMMARY
The record shows that L.D.H. was born in August 1989, and was placed under the care of the District of Columbia Department of Human Services, subsequent to the investigation of an incident which took place on August 29, 1998. On that date, neighbors reported that L.D.H. screamed "fire" and "help" from a window of the apartment where he resided with his biological mother, J.H. and J.P.S.[1] Police officers sent to the premises found L.D.H. alone in a "dirty and unkempt" apartment which "contained a minimal supply of food." The child "stated that his mother uses drugs and left him alone to go to a meeting"; and that he had not attended school "since the early part of 1998."
In early January 1999, J.H. and J.P.S. signed a stipulation. The stipulation specified that J.H. uses drugs, is unable to properly care for L.D.H., left him alone on several occasions, and has taken steps to "stay off of drugs." In addition, J.H. and J.P.S. acknowledged that L.D.H. has benefitted from his placement in a therapeutic *572 foster home.[2] Based upon the stipulation, and citing D.C.Code § 16-2301(9)(B) and (C), the trial court found that L.D.H. is a neglected child.
During a hearing on the neglect petition in March and early April 1999, a social worker testified that L.D.H. had been placed with a paternal cousin in September 1998, and that she had met with L.D.H.'s parents. While supervised visits between L.D.H. and his mother had been scheduled, the social worker indicated that the child "expressed concerns about" visitation by his father, "referring to him on a couple of occasions as the devil." Although J.P.S. "had the opportunity to have unlimited unsupervised visits" at the paternal cousin's home, he did not visit L.D.H. frequently.
J.H., the main government witness, testified that over a ten-year period, J.P.S. beat, threatened, and stalked her.[3] She described times when she was beaten and stalked, and declared that L.D.H. was present during some of these instances of domestic violence. She also recounted two occasions on which J.P.S. allegedly physically abused L.D.H. On one, J.P.S. required L.D.H. to stand in a corner of the apartment, for thirty minutes, with "his arms spread out, spread eagle. If L.[D.H.] dropped his arms just a little bit, he would smack him." On the other, when L.D.H. ran home after a fight, J.P.S. sought "to teach him a lesson on how to fight and how to take a punch." He hit L.D.H. "in the solarplex," causing the child to "los[e] air and [] gasp[]." J.H. linked J.P.S.' abusive behavior to his drinking, stating that he consumes "[W]ild Irish Rose" and becomes "meaner" when he drinks. She maintained that J.P.S. did not provide child support or financial assistance "regularly" and conditioned his support on her having sexual relations with him. In addition J.H. acknowledged that L.D.H. has learning difficulties, and has been in special education since his pre-school days.[4]
J.P.S., testifying on his own behalf, vigorously denied J.H.'s account of most events. He characterized J.H.'s testimony as "lies." He stated that he had disciplined his son by requiring him to stand in the corner "for about five to ten minutes," but had not hit him. He also maintained that he did not hit L.D.H. in the stomach, but had merely been "playing" with him.[5] He denied that his son had ever called him a devil. He accused J.H. of hitting L.D.H. Although he acknowledged that he and J.H. sometimes fought when J.H. used drugs, he accused her of being the instigator. He explained the bloody photograph of J.H., which the government introduced into evidence, as resulting from his effort to disarm his wife when she pulled a knife on him after an argument. He insisted that he had provided support for L.D.H. by giving his mother $400 per month.[6] Moreover, during the period of *573 J.H.'s incarceration in Virginia, he was L.D.H.'s sole caretaker. Furthermore, he claimed to have visited L.D.H.'s school approximately ten times, between 1993 and 1998, to speak with teachers. On the day of the fire, he went to work, leaving J.H. with L.D.H. Contrary to J.H.'s testimony, J.P.S. insisted that he did not drink to excess, and admitted that he had dropped out of an alcohol treatment program, explaining that he could not reach the building where it was held without violating a civil protection order.
At the conclusion of the hearing, the trial court issued findings of fact and conclusions of law. The court determined that the District "has proven by a preponderance of the evidence that [L.D.H.] is a neglected child" under § 16-2301(9)(A) and (B), because of abuse by his father, and due to the fact that he was "without proper parental care, education and control necessary for his physical, mental and emotional health...."

ANALYSIS
First, we are unpersuaded by J.P.S.'s argument that the trial court placed unreasonable restrictions on his efforts to impeach J.H. and to show her bias on cross-examination. "`The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" Tyree v. Evans, 728 A.2d 101, 103 (D.C.1999) (quoting Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931)) (other citation omitted); see also Roundtree v. United States, 581 A.2d 315, 323 (D.C.1990); Byers v. United States, 649 A.2d 279, 283 (D.C.1994). While a complete denial of the right of cross-examination is improper, the trial court may restrict cross-examination to matters that are probative and relevant. Tyree, supra, 728 A.2d at 103.
The record in this case shows that the trial judge was faced with an emotional hearing involving conflicting testimony from J.H. and J.P.S. The trial judge made a concerted effort to keep the parties and counsel focused on relevant and probative issues. For certain cross-examination questions, the judge required counsel for J.P.S. to show relevance, a proper foundation or factual predicate, or that the question was within the scope of direct examination. The only specific instance of purportedly restrictive cross-examination cited by J.P.S. relates to his efforts to use letters to him from J.H. to show her bias. When asked to state the relevance of the letters defense counsel asserted that since the government alleged domestic violence, he "would like to have an opportunity to probe circumstances in which the domestic violence has started, who started it, how it started and the reason for this domestic violence." When the court instructed defense counsel to "ask those questions, but stop this, did you write letters," he posed the question: "Didn't you write letters telling him that you loved him so much?" The trial judge again requested a proffer as to the relevance of the letters. However, defense counsel moved to a different question. Nonetheless, during J.P.S.' testimony, defense counsel again mentioned the letters from J.H. After objection by the government, and the trial judge's inquiry as to the relevance of the letters, defense counsel maintained that they related to "[d]omestic abuse and support for the child." When the counsel for the government and L.D.H. examined the letters and declared that they were love letters that did not mention support of L.D.H. by J.P.S., the trial judge reviewed them and confirmed that there was no mention of *574 support.[7] Furthermore, after reminding defense counsel that J.P.S. already had testified as to his support for L.D.H., the judge declared: "Love letters are irrelevant and immaterial, counsel. And those are love letters." We see no abuse of discretion.
Second, on the record before us, and contrary to the contention of J.P.S., we are satisfied that the trial judge did not display impermissible hostility and bias toward J.P.S. The test we apply to determine impermissible bias is, "whether the impartiality of the judge might reasonably be questioned." In re J.A., 601 A.2d 69, 78 (D.C.1991). In J.A., unlike J.P.S.'s case, "the record reflect[ed] extensive, increasingly hostile questioning of the mother and her housemate by the trial judge about their lifestyle." Id. at 76-77. At most, the record here shows that the trial judge was understandably somewhat impatient as she sought to ensure that defense counsel's sometimes inartful questions were relevant and asked in the proper manner, that is, with the proper foundation or factual predicate. Defense counsel made no motion requesting the judge to recuse herself. Thus, on this record we cannot say that "the impartiality of the judge might reasonably be questioned." Id. at 78.
Third, we do not agree with J.P.S.' argument that the trial court erred in admitting and relying on civil protection orders ("CPOs") resulting from an intra-family offense proceeding. Although we have said previously that "the trial judge could not properly rely on the terms of the civil protection order in the absence of an examination of the challenges raised by appellant to the findings underlying the order," In re M.D., 602 A.2d 109, 114 (D.C.1992), in the case before us, J.P.S. gave testimony that J.H. started the domestic violence, and thus, attempted to call into question the basis for the issuance of the CPOs. Moreover, we have said that, "`in appropriate cases, a judge may take judicial notice of the contents of court records in a related prior proceeding,'" especially "where, as in this case, the interested parent was a party to and was represented by counsel in the prior ... proceeding." In re J.M.C., 741 A.2d 418, 424 (D.C.1999) (citation omitted). Both J.P.S. and J.H. were present and represented by counsel during the CPO proceedings. Hence, we see no reason to question the trial court's admission of the CPOs into evidence. Nor do we see any reversible error relating to the August 31, 1998 pre-trial order which stated, under services to be provided, that there should be "alcohol treatment for father." During his testimony at the neglect hearing, J.P.S. claimed, on direct examination, that he does not drink excessively. On cross-examination, he was asked if he was "aware that there was an order in this case dated August 31st, '98, that you submit to alcohol treatment?" There was no objection to the question, and J.P.S. said that he did submit to treatment. When the government inquired as to whether he completed treatment, he said, "no," explained his reason for not doing so, and added that: "I went to look for another alcohol treatment program." In its findings of fact, the trial court stated, without explicitly referencing the August 31, 1998 order: "Mr. [S.] was ordered to attend alcohol treatment but [] discontinued going of his own volition." We detect no reversible error.
Fourth, J.P.S. asserts that "the evidence was insufficient to sustain a finding of abuse" under D.C.Code § 16-2301(9)(A) *575 and § 16-2301(23).[8] He maintains that his discipline of L.D.H. did not constitute excessive corporal punishment, and thus, did not constitute physical abuse. In addition, he argues that "belittl[ing]" L.D.H., because he did not like to fight, did not amount to mental abuse.
We have recognized that: "The primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." In re S.G., 581 A.2d 771, 778 (D.C. 1990). Moreover, "`[t]he fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents.'" Id. (citations omitted). Nonetheless, a parent's right to manage a child has its limits, and excessive corporal punishment is not permitted under D.C.Code § 16-2301(23). Thus, in J.A., supra, we concluded that: "The evidence of the frequent beatings of [two] children, resulting in permanent physical scars, is plainly encompassed by the definition of `excessive corporal punishment.'" 601 A.2d at 74 (citing D.C.Code § 16-2301(23)). Here, nothing in the record suggests that L.D.H. suffered any physical injury as a result of the punishment inflicted by his father. Nonetheless, courts examining the issue of corporal punishment by parents generally agree that it must be reasonable under the facts and circumstances of the case. See, e.g., Hildreth v. Iowa Dep't of Human Servs., 550 N.W.2d 157, 159-60 (Iowa 1996); In re B.B., 598 N.W.2d 312, 315-16 (Iowa App. 1999). J.P.S. hit his son in the stomach, purportedly to teach him to defend himself in fights. We conclude that the amount of force used was excessive, given his son's age and the fact that he was apparently retarded, because according to the testimony of J.H., which the trial judge credited, the blow caused L.D.H. to "los[e] air and [] gasp[]." Moreover, in light of the evidence that L.D.H. was present during episodes of domestic violence that caused injury to J.H., there was sufficient basis for the trial court to find not only physical abuse but also mental abuse, within the meaning of § 16-2301(9)(A).
Finally, J.P.S. complains that the trial court abused its discretion by improperly denying him visitation rights with his son, and by entering its disposition order prematurely. Our standard of review with regard to this issue is deferential, and we follow an abuse of discretion standard. See In re D.M., 771 A.2d 360, 366 (D.C. 2001), 2001 D.C.App. LEXIS 93, at *15. In fashioning its disposition order prohibiting visitation of L.D.H. by his father, the trial court relied upon the recommendation of the therapist which it described as "unambiguous."[9] Nevertheless, the trial judge made it clear during the hearing on the disposition order that J.P.S. was free to contact the therapist to discuss the matter of visitation. Under the circumstances, we see no abuse of discretion.
Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.
So ordered.
NOTES
[*] The decision in this case was originally reversed as a Memorandum Opinion and Judgment on May 24, 2001. It is now being published by direction of the court.
[1] The fire, which was extinguished, resulted from burning incense.
[2] Prior to signing the stipulation, J.P.S. apparently crossed out a sentence indicating that he abuses alcohol and has been unable to care for L.D.H.
[3] The government introduced photographs of J.H.'s bruised face, two petitions by J.H. for civil protection orders, and docket entries showing the grant of civil protective orders after court hearings at which both J.P.S. and J.H. were present with counsel. The trial court admitted these documents into evidence.
[4] The District's neglect petition described L.D.H. as "demonstrat[ing] classic signs of mental retardation."
[5] J.P.S. has three grown children and he contended that he never physically abused them or L.D.H.
[6] J.P.S. did not introduce documentary evidence of his alleged monetary support, and stated that the father of J.H.'s baby paid the rent during a period of time.
[7] The letters do not appear in the record on appeal.
[8] Section 16-2301(9)(A) specifies: "The term `neglected child' means a child: (A) who has been abandoned or abused by his or her parent, guardian, or other custodian...." Section 16-2301(23) provides, in pertinent part:

The term "abused", when used with reference to a child, means a child whose parent, guardian, or custodian inflicts or fails to make reasonable efforts to prevent the infliction of physical or mental injury upon the child, including excessive corporal punishment....
[9] The record shows that L.D.H. referred to his father as "the devil," and was fearful of him.