In re G.H., K.H., and S.H.

H.C., Appellant.

Nos. 00–FS–720, 00–FS–721, 00–FS–722.

District of Columbia Court of Appeals.

Argued March 2, 2002.
Decided April 25, 2002.

Judith A. Lovelace, appointed by the court, for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee District of Columbia.

Enid Hinkes, appointed by the court, filed a brief for appellee K.H., Sr., father of K.H. and S.H.

Michael O'Keefe, appointed by the court, filed a brief for R.H., mother of all respondents.

Before SCHWELB, REID, and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

On March 28, 2000, following a fact-finding hearing, the trial judge found that respondent S.H. was a neglected child within the meaning of D.C.Code § 16–2301(9)(A)[1] and (C) (1981),[2] and that her brothers, G.H. and K.H., were neglected children within the meaning of § 16–2301(9)(C) and (E) (1981). The judge found that, while acting *in loco parentis,* H.C., the children's mother's live-in paramour, dragged twelve-year-old S.H. by her hair, ripping out sections of hair in two places, that he kicked her in or stepped on her back, and that several days later, he struck her in the face and drew blood. The judge concluded that H.C.'s actions constituted child abuse within the meaning of the statute. The court found that R.H., the children's mother, viewed H.C.'s conduct as appropriate, and that her sons, G.H. and K.H., were therefore in imminent

---

**1.** Section 16–2301(9)(A) provides in pertinent part that a child is neglected if he or she has been "abused by his or her parents, parent, guardian, or other custodian." An "abused child" is defined in pertinent part as one whose "parent, guardian, or custodian inflicts or fails to make reasonable efforts to prevent the infliction of physical or mental injury upon the child, including excessive corporal punishment." § 16–2301(23).

**2.** Section 16–2301(9)(C) provides in pertinent part that a child is neglected if his or her parent "is unable to discharge his or her responsibilities to and for the child because of ... mental incapacity." This provision is relevant only to the adjudication against the respondents' mother, who has not appealed.

danger of being similarly abused. After the mother refused to cooperate with court-ordered evaluations, the judge found that the mother was unable to discharge her responsibilities to her children because of mental incapacity. The judge ordered that all three respondents be placed with K.H., Sr., the father of two of the children, under the protective supervision of the court.[3]

Although the mother's appellate counsel has filed a brief defending the mother's conduct, the mother has not filed a notice of appeal. H.C. is therefore the sole appellant. H.C. has standing to appeal insofar as the ruling negatively affects his reputation. *In re E.R.*, 649 A.2d 10, 12–13 (D.C.1994). We conclude that the evidence was sufficient to support the finding that H.C. abused S.H., but not the finding that H.C.'s conduct placed S.H.'s brothers in imminent danger of being abused. Because the mother did not appeal, we do not reach any other issue.

## I.

On May 19, 1999, K.H., S.H., and G.H. were living with their mother, R.H., and her boyfriend, H.C., in the District of Columbia. K.H., Sr., the father of K.H., a boy born on February 8, 1984, and of S.H., a girl born on October 5, 1986, lived in North Carolina and provided child support payments to their mother. G.H. was born on November 22, 1989. G.H.'s father was not involved in this suit. H.C. is not the father of any of the children.

Neglect proceedings were instituted after a counselor at Bertie Backus Junior High School reported to the police that a student had been assaulted by an adult man in front of a nearby McDonald's restaurant. Police identified the student in the alleged incident as S.H. This incident, as well as a second encounter between S.H. and H.C., formed the basis for the allegations of neglect.

S.H. described the McDonald's incident in her testimony before the trial court. She reported that she went to McDonald's with friends after school. From the restaurant's parking lot, she saw H.C. approaching the restaurant. She knew that H.C. was there to take her to a tutoring class which she did not wish to attend, and she sought to evade him as he got out of the car. S.H. related that H.C. approached her, grabbed her by the arm, and pushed her, and that she tripped and fell face down on the cement pavement. She testified that H.C. kicked her or stepped on her back while she lay on the ground, and that he then dragged her by her hair toward the car door. S.H. said she began crying when H.C. started pulling her hair and dragging her. S.H. reported that after H.C. had pulled her to the car door, she agreed to get in the car by herself, and she did so. S.H. subsequently noticed two bald spots on her scalp from hair that had been pulled out by H.C.

Dr. Thomas Michael Anderson, an emergency room physician at Children's National Medical Center, examined S.H. on May 25, 1999, six days after the initial incident, when a Metropolitan Police Youth Division Detective brought her to the emergency room for evaluation. Dr. Anderson testified that he observed two two-centimeter areas on the left side of S.H.'s head where her hair had been "pulled from her scalp." According to Dr. Anderson, S.H. reported that "she had been hit, kicked, and punched by her mother's boyfriend" and that "her moth-

---

3. The court had ordered the removal of the respondents from the mother's home shortly after the neglect proceedings were instituted.

er's boyfriend had grabbed her by the hair ... and had pulled her by the hair."

In addition, Dr. Anderson observed that S.H. "had a cut on the middle of her upper lip that had a crust of blood on it, a scab had already formed." He reported that the cut was approximately one-quarter inch in size. Dr. Anderson related that, according to S.H., the cut came from "a punch to the face by her mother's boyfriend" on the night before she appeared in the Emergency Room. S.H. told Dr. Anderson that the punch "occurred when the mother's boyfriend became angry at her for not telling the truth about where she was going that night." Dr. Anderson testified that so far as he could determine, these were the only injuries that S.H. had sustained.

The mother, who had also been charged with neglecting S.H., testified at the fact-finding hearing. The mother sought to defend her boyfriend's actions, but her testimony substantially supported her daughter's account in relation to both incidents. The mother testified that S.H. told her about the bald spots, and that she saw a small area on her daughter's head that was completely bald. She testified that H.C. hit her daughter with "little taps," but she demonstrated the "taps" by "slap[ping] herself in the face." She acknowledged that the "taps" left a red area on S.H.'s face for a short period and that S.H. began to bleed as a result, but "[i]t was just a little, little blood."

H.C. testified on his own behalf, and he denied that he harmed S.H. on either occasion. With respect to the McDonald's incident, H.C. stated that he had argued with S.H. for a few minutes about her going to tutoring.[4] He asserted that "[w]hen I began to approach [S.H.], she sat down on the ground.... I proceeded to grab her by

the back of her clothing and pulled her to the car ... I opened the car and forced her into the car and I took her to the tutor." He claimed that he never noticed any injury, that S.H. did not complain of any injury, and that S.H. did not cry. When asked to explain the bald spots on S.H.'s head, H.C. testified as follows:

The Witness: ... [T]he only thing I can imagine is that when I grabbed her, I must have caught her braids up in the clothing when I grabbed it.

The Court: How could you catch the side of her braids ... if you had the back of her hair?

The Witness: No ... I'm grabbing the back here and I must have grabbed the braid in the clothing when I got it in here.... I didn't grab her by the braids and pull them out of her head. I didn't do that.

With respect to the second incident, H.C. testified that, contrary to instructions that she had received, S.H. did not come home on a school night until 10:00 or 10:30 p.m., long after dark. He testified that when S.H. came in "I approached her very deliberately and ... I didn't, or I don't recall hitting her. I recall bumping into her and speaking to her in as frightening a voice as I could ... to make her come home at night before dark." H.C. was questioned further on cross examination:

Q: [In the] incident where [S.H.] stayed out late, you're saying you didn't hit her at all, is that correct?

A: No, I didn't, not with my hand. No.

Q: You didn't hit her with your hand.

A: No.

Q: What did you hit her with?

A: Actually, I didn't hit her, I just walked into her.

---

4. According to S.H., her father had told her she did not have to go to tutoring. When she

related this information to H.C., H.C. responded with an obscenity.

Q: So what, your walking into her caused her mouth to bleed?

A: I don't know what caused her mouth to bleed. I didn't, when I was there, her mouth ... was not bleeding.

In sum, H.C. denied dragging S.H. by her hair, he denied kicking her, and he denied striking her in the face.

The trial judge credited the testimony of S.H., Dr. Anderson, and R.H., and she did not believe the account provided by H.C. The judge found, *inter alia*, that

6. Mr. [C.] grabbed [S.H.] by the hair and dragged her for fifteen feet to the car, causing her to lose her hair in two separate areas of her scalp.

...

8. The Court finds that on another occasion, Mr. [C.] slapped [S.H.] in the face and that he drew blood.[5]

Based on these findings, the court concluded, *inter alia*, that H.C. had abused S.H. within the meaning of D.C.Code § 16–2301(9)(A).[6] Finding that S.H.'s brothers were also in imminent danger of similar abuse, the judge ordered that all three children be placed with K.H., Sr., the father of S.H. and K.H., under the protective supervision of the court. H.C. filed a timely notice of appeal.

## II.

Although H.C. is in no position to complain of the disposition of the children in the absence of an appeal by the mother, see Part III, *infra*, we conclude that H.C.

has a reputational interest sufficient to provide him with standing to challenge the finding of abuse. To adapt our language in *In re E.R., supra*, 649 A.2d at 12,

> an adjudication of neglect may have serious consequences for a parent, especially where, as here, the judge has found that [H.C. abused S.H.].
>
> ....
>
> Should a subsequent claim of neglect be charged, we believe that the initial finding at issue in this appeal might at some juncture adversely reflect upon [H.C.].

(Citations and internal quotation marks omitted.)[7]

It is undisputed that H.C. was acting in *loco parentis* vis-a-vis S.H. and her brothers. In the trial court, the District had the burden of establishing, by a preponderance of the evidence, *In re S.K.*, 564 A.2d 1382, 1382–83 (D.C.1989), that H.C. inflicted physical or mental injury upon S.H. D.C.Code § 16–2301(23). H.C. contends that "[t]here is nothing ... about what happened before, during or after [the McDonald's] incident which carries indicia of abuse within any meaning of the word or [of the statute]." H.C. asserts that he "tried to deal firmly with two serious problems in the raising and protecting of a rebellious adolescent." *Id.* at 2.

The trial judge found otherwise, and the scope of our review of the judge's findings is limited. The judgment in a case tried by the court without a jury may not be set aside except for errors of law unless it is

---

5. Although the judge did not mention it in her findings, she appeared to accept, during the evidentiary hearing, S.H.'s testimony that H.C. kicked her in the back or stepped on her back.

6. The judge found that the incidents that we have described constituted "torture." In our view, that characterization is too extreme and is therefore unwarranted.

7. H.C. has not shown that there are other children in his care and, if there are none now and unlikely to be any in the future, the potential collateral consequences of the finding of abuse may be somewhat attenuated. No party has, however, challenged H.C.'s standing, and we conclude that his interest in his reputation is sufficient to support this aspect of his appeal.

"plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001). This is so because the trial judge is on the scene and "able to observe and assess the demeanor of the witnesses," whereas the appellate court is "limited to a paper record which may capture the words of a case but not its heart and soul." *In re S.G.*, 581 A.2d 771, 774 (D.C.1990). Moreover, as we noted in *In re T.M.*, 577 A.2d 1149, 1151 (D.C.1990),

> we must consider the evidence in the light most favorable to the [District], giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences. The [District] is entitled to the benefit of all reasonable inferences from the evidence[.]

(Citations omitted.)

■ Our neglect statute does not proscribe all physical chastisement of a child by a parent or by one acting *in loco parentis*. On the contrary, the legislature's prohibition of "*excessive* corporal punishment" in § 16–2301(23) (emphasis added) necessarily means that non-excessive corporal punishment does not constitute child abuse. The question is whether the physical force used by H.C. against S.H. was "reasonable under the facts and circumstances of the case." *In re L.D.H.*, 776 A.2d 570, 575 (D.C.2001) (citation omitted).[8] *See also Carpenter v. Common-*

*wealth*, 186 Va. 851, 44 S.E.2d 419, 423 (1947):

> [T]he great preponderance of authority is to the effect that a parent has a right to punish a child within the bounds of moderation and reason, so long as he does it for the welfare of the child.

■ Viewing the record in the light most favorable to the District, the trial judge could reasonably find by a preponderance of the evidence that H.C. used unreasonable force against S.H. As previously noted, S.H. described the two instances of physical abuse by H.C., as well as the injuries to her head and face. Dr. Anderson's testimony corroborated the physical injuries S.H. described. The mother's testimony supported her daughter's account in key respects. The mother demonstrated how H.C. struck S.H., and she reported that her daughter was bleeding as a result. Credibility determinations were for the judge, as the trier of fact, and we cannot second-guess them. *In re S.G.*, *supra*, 581 A.2d at 774. Moreover, the judge could reasonably infer consciousness of guilt, and therefore guilt itself, from H.C.'s apparently false exculpatory statements.[9]

■ The judge could also reasonably conclude "under the facts and circumstances of the case," *In re L.D.H.*, *supra*, 776 A.2d at 575, that H.C.'s actions consti-

---

8. A person standing *in loco parentis* is subject to the same rules as a natural parent with respect to the use of force vis-a-vis a child. "Moderate and reasonable punishment or correction, exercised in good faith for the benefit of the child, is authorized, but for an abuse of the right the person standing *in loco parentis* will be criminally liable," 67 CJS *Parent and Child* § 155, at 552 (1978) and, *a fortiori*, subject to a finding of child abuse. *See also Carpenter*, *supra*, 44 S.E.2d at 423 ("Generally, it is held that persons standing *in loco parentis* have the same right in this respect as have natural parents[.]").

9. As we have previously noted, "false exculpatory statements ... may give rise to an inference of consciousness of guilt, from which guilt itself may be inferred." *Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991) (citing II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979) ("[I]t has always been understood ... that a party's falsehood or other fraud in the ... presentation of his cause ... is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.")).

tuted child abuse. H.C. dragged an adolescent child by her hair with enough force to pull her hair out from its roots leaving her scalp exposed. He kicked or stepped on her back. A few days later, he struck her in the face and left her bleeding. It is true that S.H. was not seriously injured, but we have held that serious injury need not be shown to sustain a finding of abuse. *Id.* However unruly and difficult S.H. may have been,[10] we cannot reject as unreasonable the trial judge's finding that the force used was excessive.

■ The judge also found that, as a result of H.C.'s conduct and the mother's tolerance of it, S.H.'s brothers were "in imminent danger of being abused," D.C.Code § 16–2301(9)(E), because their sibling was abused. *Id.* The gravamen of the evidence before the court regarding the two brothers was to the effect that they were happy in their mother's home and doing well, and we discern no adequate support for a finding that H.C.'s conduct so endangered them that their removal from the home was warranted on account of his actions.

**10.** The mother testified at trial that S.H. "got with the wrong group of people and she stopped going to school. She stopped doing her homework. She would get angry in the house and she would throw everything out [of] the drawers and throw her drawers down the steps." The mother also reported that S.H. was skipping school and defying her mother's orders in many respects. She testified that she was very worried that her twelve-year-old daughter would hurt herself with her behavior. The judge credited this testimony.

**11.** *See In re S.K., supra,* 564 A.2d at 1390 (concurring opinion):
The question whether the state should interpose itself into the relationship between a parent and child is a sensitive one. The primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15[] (1972).

## III.

■ H.C. contends that even if he used excessive force in two isolated instances vis-a-vis S.H., this did not warrant intrusion by the state into the lives of the members of this family or the removal from the mother's home of the children, including S.H.'s brothers, who had not been abused at all and who were said to be happy living with their mother. On the merits, his position is not an implausible one.[11] Nevertheless, in the absence of an appeal by the mother from the trial court's disposition order, we are in no position to decide whether there is substantive merit in H.C.'s position.

Once abuse had been found, the only real issue at disposition was whether the children should remain with their mother, who was still living with H.C., or with K.H., Sr., the father of two of the children, who is a resident of North Carolina. The court's probation officer and supervisory probation officer recommended, and the judge ordered, that all three children be placed with K.H., Sr.

Although [we] view the welfare of the child as paramount [citation omitted], the child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit. *In re N.M.S.,* 347 A.2d 924, 927 (D.C.1975).
State intervention in the lives of families does not come without cost to the child. As one commentator has observed,
there is substantial evidence that, except in cases involving very seriously harmed children, we are unable to improve a child's situation through coercive state intervention. In fact, under current practice, coercive intervention frequently results in placing a child in a more detrimental situation than he would be in without intervention.
(Quoting Michael Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards,* 27 Stan. L.Rev. 985, 993 (1975)).

As a non-parent, H.C.'s claims as to at least two of the children, S.H. and K.H., are obviously inferior to those of K.H., Sr., who is their biological father. As to the third child, G.H., the decision to keep all three respondents together was eminently reasonable. Moreover, if H.C. were permitted to litigate the merits of the disposition and prevail, then the children would presumably have to be returned to the mother, who has acquiesced in the placement with K.H., Sr., by failing to appeal from the judge's ruling.[12] As we have stated in a concededly different context, "[t]he status assumed by one *in loco parentis* is a somewhat nebulous legal relationship of a temporary character." *Fuller v. Fuller*, 247 A.2d 767, 770 (D.C.1968), *petition denied*, 135 U.S.App. D.C. 353, 418 F.2d 1189 (1969) (internal quotations and citations omitted). H.C.'s rights as a person acting *in loco parentis* are surely subordinate to the rights of the mother with whom H.C. has been living; if she has no legal right to have the children returned to her, then her paramour cannot have such a right. The mother, having waived any legal right to have the trial court's disposition order altered in her favor, H.C. can have no such legal right.

### IV.

For the foregoing reasons, we conclude that the evidence was sufficient to support the trial court's finding that H.C. abused S.H., but insufficient to support the finding that H.C.'s conduct placed G.H. and K.H. in imminent danger of being abused. In the absence of an appeal by the mother, we leave the trial court's disposition order undisturbed.

*So ordered.*[13]

REID, Associate Judge, concurring:

I fully support Judge Schwelb's opinion regarding this matter. I write separately solely to emphasize our conclusion "that the evidence was … insufficient to support the finding that H.C.'s conduct placed G.H. and K.H. in imminent danger of being abused." Consequently, there was no basis on which to remove them from R.H.'s care. While R.H. filed a brief challenging the adjudication of all of her children as neglected, she failed to file an appeal. Thus, I agree that she has waived her right to challenge the disposition order.

Since H.C. is neither the adoptive nor the biological father of G.H. and K.H., he must cite some authority permitting him to challenge the adjudication with respect to G.H. and K.H. He has not done so. Nor has he demonstrated that the adjudication pertaining to G.H. and K.H. has resulted in a "stigma and collateral consequences" for him. *See In re E. R.*, 649 A.2d 10, 12 (D.C.1994). Under these circumstances, I am constrained to agree with Judge Schwelb that the trial court's disposition order must be left undisturbed, even though there is insufficient evidence to support a finding of neglect with respect to G.H. and K.H.

---

**12.** Throughout these proceedings, the mother made it clear that she did not have any confidence in the court or the social workers and mental health professionals assigned to the case.

**13.** Following the entry of the disposition order in the instant case, K.H., Sr., filed a motion in the related divorce case asking the court to grant him custody of K.H., Jr. and S.H. On November 1, 2001, in a comprehensive 28 page order, Judge Robert E. Morin granted custody to K.H., Sr. *See [R.H.] v. [K.H.]*, No. 3552–95(D) (Super.Ct.D.C. Nov. 1, 2001). The disposition of that case adds still another hurdle to H.C.'s attempts to challenge the disposition of the neglect case.