Arnell W. SHELTON, Appellant,

v.

UNITED STATES, Appellee.

No. 02–CF–1197.

District of Columbia Court of Appeals.

Argued Oct. 3, 2007.*

Decided Nov. 12, 2009.

* Following oral argument the court *sua sponte* ordered the parties to file supplemental briefs.

Sandra K. Levick, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Sharon A. Sprague, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III and Wanda Dixon, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, Associate Judge, and SCHWELB and KING, Senior Judges.

RUIZ, Associate Judge:

Appellant, Arnell W. Shelton, was found guilty by a jury of assault with intent to kill while armed,[1] aggravated assault while armed,[2] two counts of possession of a firearm during a crime of violence,[3] carrying a pistol without a license,[4] and malicious destruction of property.[5] Appellant's principal claim is that the trial judge did not allow him to introduce evidence of the fact that the government had withheld exculpatory statements made by the complainant during his first trial,[6] evidence that the prosecutor did not disclose until the eve of the second trial. Appellant contends that with that evidence, he could have argued to the jury that in the government's own view the case against appellant was not as strong as the government purported it to be. We agree that the defense should have been permitted to present to the jurors the prosecutor's failure to disclose exculpatory evidence, as required by *Brady*, and, moreover, to argue that the jury could and should infer from that failure that the government was concerned about the impact of such disclosure on the government's case. Although the exclusion was error, appellant is not entitled to reversal, however, because we conclude that the error was harmless. We therefore affirm.

## I. Facts

The government presented evidence that at around 11:00 p.m. on January 14, 2001, Christopher Boyd drove to Melon Street, Southeast, to visit his mother. Boyd stopped in front of her house, where he planned to double-park, and saw his mother standing outside talking to neighbors. Suddenly, a blue "foreign make Toyota" raced up along the left side of Boyd's car. Boyd saw appellant "hanging out the window" of the Toyota, and he soon "was struck by a bullet."[7] Boyd testified that he heard the shots and saw the "fire from the gun."[8] When Boyd tried to drive away, the car that was carry-

---

1. D.C.Code §§ 22–401, –4502 (2001).

2. D.C.Code §§ 22–404.01, –4502 (2001).

3. D.C.Code § 22–4504(b) (2001).

4. D.C.Code § 22–4504(a) (2001).

5. D.C.Code § 22–303 (2001).

6. The first trial, held in March 2002, ended in a mistrial because the jury was unable to reach a unanimous verdict. Judge Weisberg presided over the first trial as well.

7. Boyd had been seated in the driver's seat of his car, which had tinted windows that were rolled up. He testified that he had been look-

ing backwards over his left shoulder when the car carrying appellant approached. Boyd saw appellant's face as appellant reached out of the front passenger-side window of the blue Toyota, holding his two arms together, fully extended. Boyd stated that he was certain appellant was the shooter. Although Boyd admitted that he drank a "small portion" of vodka en route to Melon Street, he was confident that he was not intoxicated or "tipsy" and that the drink had not impaired his ability to perceive the identity of the shooter.

8. Appellant was about two feet away from Boyd when he fired the shots.

ing appellant continued to stay next to him as he traveled down the street. Boyd eventually escaped by turning down an alley.

Boyd drove himself to Greater Southeast Hospital, and passed out. Boyd testified that he was "in and out of consciousness" while at the hospital, and "didn't really know what was going on at the time." Boyd "remember[ed] waking up and a police officer [was] in front of [him]," but did not remember having a "conscious conversation" with the officer (Officer Edward Woodward). Boyd was soon transferred to the Intensive Care Unit at Washington Hospital Center for emergency treatment.

Two days after the shooting, Boyd was interviewed by Detective James V. Francis at Washington Hospital Center. Detective Francis asked Boyd if he knew the identity of the person who shot him, to which Boyd unhesitatingly responded: "Arnell White Boy shot me." Boyd further stated that he had known "Arnell White Bay" [i.e., appellant] for more than five years, and that appellant was the person who had fired the shots from the front passenger seat of the blue Toyota. Boyd again confirmed appellant's identity when Detective Francis showed him a photo of appellant.

Andrew Durham saw the shooting. He knew appellant and Boyd from the neighborhood, but was not close to either one of them. Durham testified that he saw Boyd "pull[ ] up and . . . talk[ ] to some guys in front of his mother's house." A couple of minutes later, a "small little Nissan or Honda, . . . a small four-door car with tinted windows" drove up beside Boyd's car. Durham heard gunshots and saw that Boyd was being shot as he sat in his car. The shooter's car then continued past Boyd's car, and Durham saw the shooter "lift his head up and look out the window." [9] Durham recognized appellant as the shooter. He then watched appellant fire additional shots at Boyd as the two cars drove away.

Boyd and his "play cousin," Myra Ferguson, testified about the events that likely precipitated the shooting.[10] In April 2000, about ten months before Boyd was shot, Ferguson had accepted a ride home from appellant, whom she knew from the neighborhood. While they were in the car, appellant tried to kiss and fondle her and to unzip her pants, ripping her underwear in the process. When appellant continued the assault after Ferguson told him to stop, she hit him in the groin, got out of the car, and walked home. Ferguson did not tell anyone about this incident because she was "embarrassed about the whole situation" and "really [didn't] want anyone to know about it."

A couple of weeks later, Boyd learned of appellant's sexual assault when appellant talked about it at a party. Boyd eventually told Ferguson's brother, Derrick, about the incident. Derrick was upset and decided to look for appellant. Derrick Ferguson soon found appellant standing outside on Newcomb Street and confronted him, accompanied by his sister and Boyd. Derrick and appellant started fighting. Appellant then ran inside a building, at which point Derrick Ferguson began "busting [appellant's] car windows out of

9. Durham testified that at first he could not see the shooter's face because he was then looking through the tinted windows of both cars. Once the shooter's car stared to pull away, Durham had a better view and was able to see the shooter's "whole face" and his arm from the elbow down. Durham identified appellant in court as the shooter.

10. Ferguson stated that she and her brother, Derrick Ferguson, were "like family" to Boyd. She was sixteen years old at the time of the shooting.

his car." Neither Boyd nor Myra Ferguson helped damage appellant's car.

Officer Edward Woodward, who had been one of the first officers on the scene after the January 2001 shooting, testified on behalf of appellant at trial. Officer Woodward had also interviewed Boyd at Greater Southeast Hospital approximately 45 minutes after the shooting. During that interview, Boyd did not tell the officer that he had seen or recognized who shot him. Officer Woodward could not remember Boyd's "exact words, if he said I don't know or I didn't see or all's I saw was ... someone shoot at me from a from a dark-colored car." Officer Woodward also asked Boyd "if he had a beef with [appellant] earlier in the summer." [11] According to Officer Woodward, Boyd responded that there had been a dispute and that it pertained to "an unwanted sexual advance on one of [Boyd's] cousins." Boyd did not, however, state that appellant had also been the one who shot him. Officer Woodward further testified that Boyd "appeared to be in pain, scared, kind of unsure of what was going to happen to him" during the interview.

Appellant presented an alibi defense through the testimony of his wife, Sharia Shelton, who said that appellant had been with her and their seven-month-old daughter watching TV on that Sunday night—a "family day" at their home—when the shooting took place. The prosecutor cross-examined Ms. Shelton and sought to impeach her as biased, because she had refused to tell the prosecutor in the first trial about the alibi after he had called her for any information that could exonerate her husband.

The prosecutor argued in closing that appellant wanted "revenge" because "Christopher Boyd caused him to be shamed and publicly humiliated." The government's theory was that appellant viewed Boyd as the instigator, "set[ting] into motion th[e] chain of events," that led Derrick Ferguson to beat appellant and bash his car in public.

## II. *Brady* Violation

Neither before nor during appellant's first trial, see note 6, *supra*, was defense counsel informed that Boyd had failed to identify appellant as the shooter when he was questioned at the hospital, and that Officer Woodward had brought up the "beef" Boyd had with appellant several months earlier. Indeed, this information was not disclosed until the eve of the second trial, by Assistant United States Attorney ("AUSA") Wanda Dixon, who had replaced AUSA Andrew Kline, the prosecutor who represented the United States during the first trial. Defense counsel informed the trial court of the late disclosure, argued that it was a *Brady* violation,[12] and requested that the case be dismissed. Upon being apprised of the situation, the trial court provided the parties with "a chance to find out ... as much as [possible]" about "where this information [came] from, when it came to the United States Attorney's Office, why it wasn't disclosed earlier."

---

11. It is unclear how Officer Woodward knew about the fight between Derrick Ferguson and appellant. At oral argument, the government represented to the court that the officer might have obtained such information through contacts developed through the Metropolitan Police Department's community policing.

12. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194.

The following day, the trial judge questioned the prosecutor:

**The Court:** But I still don't understand why [defense counsel] did not get [this information] before we went to trial the first time.

**Prosecutor:** Your Honor, it was [the former prosecutor's] position that the information was not exculpatory.

**The Court:** Do you want to explain his rationale (indiscernible)?

. . . .

**Prosecutor:** My understanding is that [the former prosecutor's] position was based on the thought that there was a reason for the witness to respond in that way. The reason being that the witness was in pain. He had just been taken to the hospital. He was on a gurney, staff attending to him, etc. Your Honor, and if I may also approach the bench ex parte, I have something else I can tell the Court.

(*Ex parte* bench conference with the Government attorney, Ms. Dixon, which was indiscernible.) [13]

(Open court.)

**The Court:** When I said I don't get the first thing, what I meant was [that] given the prosecutor's obligations under *Brady v. Maryland, I don't see how a prosecutor who states that if a witness says I don't know who shot me or I didn't see who shot me or all I saw was a dark car, who's later going to come into court and say Arnell Shelton shot me, I saw it, saw him, should not turn that over because the prosecutor doesn't think it's true.*

**Prosecutor:** Yes, Your Honor, and I'm not saying that that's my position at all.

**The Court:** Well, *I mean, I don't see how any prosecutor could take that position. . . . I don't see how any prosecutor anywhere in any state in the country, could say that I don't have to turn that over because I think I know why he said that.*

. . . .

**The Court:** *[I]t wouldn't have taken me five seconds to figure out that that's something that the defense was entitled to know.*

(Emphasis added.)

The trial judge was "strongly disinclined" to grant (and eventually rejected) the motion to dismiss the case as a "punitive sanction for the failure to turn over" Boyd's exculpatory statement, but offered to continue the trial date if defense counsel needed additional time to prepare. Counsel stated that she was ready, and declined the offer for a continuance. At trial, defense counsel called Officer Woodward as a witness. After defense counsel elicited the substance of Boyd's statements from when Officer Woodward interviewed him at the hospital, in cross-examination the government stressed the ambiguities and vagueness of what the officer recalled. On redirect, defense counsel tried to question Officer Woodward about the late disclosure of the exculpatory statement Boyd had made:

**Defense Counsel:** Officer Woodward, when was the first time you came forward and told us what you knew? [14]

---

13. The *ex parte* bench conference between the prosecutor and the trial judge was not transcribed, because the recording was "indiscernible." Appellant's counsel asked the government and the court to try to reconstruct the bench conference for purposes of appeal. These efforts were unsuccessful. Neither the judge nor the prosecutor remembered what had transpired.

14. The day before the second trial was set to start, the prosecutor informed defense counsel about Officer Woodward's interview with Boyd. Defense counsel then interviewed Officer Woodward.

**Prosecutor:** Objection.

**The Court:** Who's the us and—

**Defense Counsel:** When you spoke to myself and my investigator what you knew?

**Prosecutor:** Objection, relevance.

**The Court:** I'll sustain the objection.

**Defense Counsel:** Well, Detective, I mean Officer Woodward, it's fair to say you spoke to me the other day, correct?

**Officer Woodward:** Yes.

**Prosecutor:** Objection.

**The Court:** Wait a minute, I will ask you to come to the bench at this point.

(Bench conference.)

**The Court:** I think I'm going to cut this one off, Miss Rodriques, if you're going where I think you're going. What are you up to?

**Defense Counsel:** I'm going to remind him about what he told us.

**The Court:** I don't have any problem with that, . . . but the implication that he's never told anybody is not proper.

**Defense Counsel:** Implication.

**The Court:** I don't want you to go[ ] into what he told [the first prosecutor], why [he] didn't tell you, the jury's not going to hear that.

**Defense Counsel:** Well, where I did want to go, Your Honor, the Government never told us until two days ago.

**The Court:** No.

**Defense Counsel:** Playing dirty.

**The Court:** Remedy for that was as much time as you needed to prepare for it and you said you were ready, that's it, *there's no other sanction* you're going to get for [late] disclosure and—

**Defense Counsel:** So the court's ruling is that the jury won't hear this?

**The Court:** Correct.

(Close bench conference.)

(Emphasis added.)

### III.  Analysis

#### A.  *Admission by Conduct*

Appellant argues on appeal that the trial judge improperly prevented defense counsel from questioning Officer Woodward further in order to bring to the jury's attention the government's eleventh-hour disclosure, on the eve of the second trial, that when Officer Woodward first interviewed Boyd at the hospital, Boyd had not identified appellant as the shooter. From this nondisclosure, appellant argues, the jury could have inferred that the government (during the first trial) was concerned that the exculpatory evidence seriously undermined its case. This was not just a reasonable and permissible inference, appellant contends, but a powerful one, because, as the trial court commented, there was no question that the government had an obligation to reveal it to the defense before the first trial. That the government so clearly breached its *Brady* obligation to disclose the information reflects the importance attached to it.

The government contends that we are limited to review for plain error, because appellant is challenging the trial court's ruling on grounds that were not asserted at trial. *See, e.g., Watts v. United States,* 971 A.2d 921, 930 (D.C.2009) (citing *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). According to the government, although defense counsel asked the trial court to admit into evidence the government's failure to disclose the exculpatory statements, appellant did not preserve the specific claim he makes on appeal—that he wanted to introduce evidence of the government's withholding of exculpatory evidence to prove admission by conduct. Appellant, on the other hand, argues that his claim was

properly preserved, even if not made with the precision of the argument it has presented on appeal, citing *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), and a number of our cases that have applied it. Specifically, appellant contends that by saying "playing dirty" after the judge sustained the government's objection based on relevance, defense counsel let the trial court know (albeit in a short-hand way) that the evidence was relevant because the prosecutor's failure to disclose exculpatory evidence showed that the government knew that its case against appellant was weak. That proposed inference, however, was never fully explained to the trial judge. Nor did defense counsel correct the record when the trial judge commented that there would be "no other sanction" for what the judge perceived to be a clear case where *Brady* required disclosure, when there had been no sanction imposed on the government (rather, defense counsel had been allowed additional time to prepare). We recognize, however, that it can be awkward for counsel to continue to press when it is apparent that the court did not grasp (perhaps due to counsel's abbreviated explanation) that defense counsel was not seeking a sanction, but arguing for a permissible inference drawn from admissible evidence. As we have noted, the distinction between a new claim on appeal and a new argument presented on appeal in support of a claim that was asserted in the trial court can be difficult to draw; this is such a case. *See, e.g., Anthony v. United States,* 935 A.2d 275, 282 & n. 10 (D.C.2007); *Wilson–Bey v. United States,* 903 A.2d 818, 839 n. 39 (D.C.2006) (en banc), *cert. denied* 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007). We need not decide whether the

claim was adequately preserved, however, because, although we conclude that the trial court erred in excluding the evidence and precluding counsel from arguing its relevance to the jury, we conclude also that the error was harmless.

### 1. *Was there error?*

■ Appellant proffers that if allowed, counsel would have argued that because the government—as the court correctly noted—so clearly breached its obligation to disclose exculpatory evidence until the eve of the second trial, it must have been because it was conscious that a full exposition to the jury would reveal that its case against appellant was weak and needed to be protected from a vigorous defense based on Boyd's initial statement to Officer Woodward at the hospital when he could not identify the person who shot him.[15] Appellant argues that the basis for this proposition is already recognized in the law.

In *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court observed that "conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* at 446 n. 15, 115 S.Ct. 1555. The Court held that the fact that the government withheld *Brady* material could damage the prosecution's case by creating doubt about "the good faith of the [criminal] investigation." *Id.* at 445, 115 S.Ct. 1555; *cf. Wilson v. United States,* 162 U.S. 613, 621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) ("The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt, to be dealt by the jury."); *see also Farley v. United States* 767 A.2d 225, 241 (D.C.2001) (Ruiz, J.,

---

**15.** To be clear, appellant's argument is not that admission of the evidence and argument should have been allowed as a sanction against the government, but as substantive

evidence aiming to present a defense of general denial by showing that the government's case against appellant was in fact weak.

dissenting) (noting that undisclosed "testimony [about unwarranted physically abusive treatment of paraplegic by police during crime investigation], if believed, ... [could] seriously impeach[ ] not only the officers' testimony at trial, but also more broadly, the propriety of the police's conduct of the investigation generally"), *cert. denied* 534 U.S. 982, 122 S.Ct. 415, 151 L.Ed.2d 316 (2001).

We have employed similar reasoning in other settings to permit an inference of a party's consciousness of guilt. In *In re G.H.*, 797 A.2d 679 (D.C.2002), a child neglect proceeding, we held that a fact finder may infer consciousness of guilt from a party's false exculpatory statements. *Id.* at 684 n. 9. Appellant argues by analogy that *In re G.H.* supports his argument that, similar to an inference of consciousness of guilt, an inference that the case is weak can be drawn to impugn the prosecution when it has resorted to "dirty" tactics by withholding exculpatory evidence it was required to disclose. Indeed, in the civil context, we have accepted that argument. In *District of Columbia v. Perez*, 694 A.2d 882 (D.C.1997), the District government had defended survival and wrongful death actions alleging medical negligence by hospital employees, and, in doing so, presented the patient's clinic records which had been falsified by the attending doctor and nurse (employed by the District of Columbia) after learning of her death. *Id.* at 885 & n. 8. We recognized that the jury could draw an adverse inference against the District based on the misconduct of its agents. *Id.* at 885 n. 8.

Although we have not addressed whether in a criminal trial a prosecutor's breach of duty—here, the withholding of exculpatory evidence—can be used to draw an inference that the prosecutor's action was motivated by the belief that the government's case was weak, as a way of proving that the case was, in fact, weak, the reasoning upon which we relied in *Perez* is equally applicable here:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

*Id.* (quoting II J. Wigmore, Evidence § 278), at 133 (Chadbourn ed.1979).

Appellant cites to several opinions from other jurisdictions, which we deem persuasive. In *United States v. Remington*, 191 F.2d 246 (2d Cir.1951), for instance, the court held that "[e]vidence of efforts to suppress testimony or evidence in any form like the spoliation of documents is affirmative defense of the weakness of the prosecution's case." *Id.* at 251.[16] Two early cases predating the *Remington* opinion, one from Massachusetts and another from the Court of Appeals for the Second Circuit, held that "if the district attorney should unfairly suppress evidence he would thereby subject the case of the commonwealth to the same adverse inferences as would result from similar conduct by any other party to a cause." *Common-*

---

**16.** In *Remington*, the court distinguished between the probative value to the defense of efforts to suppress evidence, and any disciplinary sanction that might result from the misconduct. *Remington*, 191 F.2d at 251. We do so here as well. See note 15, *supra.*

*wealth v. Enwright,* 259 Mass. 152, 156 N.E. 65, 67 (1927). The Second Circuit was even more emphatic:

> If the jury could have been persuaded to believe that the government's representatives in charge of the prosecution had previously tried to convict appellants Graham and McKay by means in part at least of the testimony of Moore which they knew was fabricated, which they, indeed, had aided in fabricating, and were still trying to do so even after Moore had recanted, the basis would have been laid for the same presumption against the government that arises against persons who fabricate, suppress or destroy testimony. Omnia praesumuntur contra spoliatorem.[17] The jury would then have had reason enough for concluding that the prosecutor was conscious that his case against the appellants was lacking in merit and that they were innocent men unjustly accused.

*United States v. Graham,* 102 F.2d 436, 442 (2d Cir.1939).

Similarly, in *United States v. Boyd,* the Seventh Circuit held that:

> [t]he gravity of the prosecutors' misconduct ... may support ... an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that *without such tactics the defendants might be acquitted.* If the prosecutors did not think their case airtight (and so they tried to bolster it improperly), *this is some indication that it was indeed not airtight.*

55 F.3d 239, 241–42 (7th Cir.1995) (emphasis added) (citations omitted).[18]

The Tennessee Court of Criminal Appeals has stated:

On the issue of the alleged spoliation of the State's diagram of the scene, the record shows that sometime after one of the eyewitnesses had begun testifying at the original trial of this case, a mistrial was ordered on the defendant's motion. In preparation for the retrial, the prosecutor erased certain marks put on the diagram by the eyewitness indicating the location of various people who were inside the house at the time. The defendant insists that this deliberate erasure had the effect of depriving him of effective cross-examination in the subsequent trial and that it constitutes "*affirmative evidence of the weakness of the prosecution*" under *United States v. Remington* and similar cases. This latter conclusion is correct as a matter of law, provided the circumstances of the act manifest bad faith on the part of the prosecution.

*Williams v. State,* 542 S.W.2d 827, 831 (Tenn.Crim.App.1976) (emphasis added) (citation omitted).

We are persuaded by the analysis in the cases we have discussed and conclude that defense counsel had a basis in law to argue that the government's nondisclosure of exculpatory information was akin to an admission by conduct that the government was conscious that its case was weak (and that it was in fact weak) and that appellant should have been allowed to present that evidence. The reasonableness and strength of the inference necessarily depend on the extent or gravity of the misconduct. On the record we have, we see no reason to disagree with the trial court's assessment that the evidence should have been disclosed, as the prosecutor in the second trial recognized. See note 14, *su-*

---

**17.** "All things are presumed against a wrongdoer." *Graham,* 102 F.2d at 442.

**18.** In *Boyd,* the prosecution had knowingly used perjured testimony and failed to disclose

the "stream of unlawful, indeed scandalous, favors from the staff at the U.S. Attorney's office [to the witnesses] while [they were] jailed...." 55 F.3d at 241, 244.

*pra.* As the trial court stated, it is difficult to "see how any prosecutor anywhere in any state in the country," could think otherwise. Thus, to preclude the defense from presenting evidence of the government's deliberate nondisclosure to the jury was legal error.[19]

### 2. *Did the error prejudice appellant?*

■ We do not reverse convictions in order to punish prosecutors, *see United States v. Hasting,* 461 U.S. 499, 506–7, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), but to remedy prejudice resulting from the trial court's error in excluding evidence of the prosecutor's nondisclosure that was probative of the questions that were presented to the jury for decision.

Here, even if the court had allowed evidence of the government's *Brady* violation to come in, and defense counsel had argued to the jury that the government withheld the evidence because it thought its case was weak, we can conclude, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error. . . ." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Although appellant was unable to present evidence that at the first trial the government had failed to disclose Boyd's interview with Officer Woodward, and to argue to the jury that the government had done so because it considered that the

revelation would seriously undermine the prosecution, the fact remains that by the close of the second trial, the jury was presented with the substantive evidence that Boyd had initially failed to identify appellant at the hospital. Ultimately, the jury rejected that evidence as not dispositive on the issue of identification. It is not difficult to see why. Boyd's statement at the hospital was recounted in Officer Woodward's testimony, which, due to its ambiguity, did not have much force:

> **Defense Counsel:** Did [Boyd] tell you I don't know who shot me . . . ?
>
> **Officer Woodward:** I'm not sure of his exact words, if he said I don't know or I didn't see or all's I saw was a dark colored, someone shoot at me from a dark-colored car.

Although Officer Woodward later testified that Boyd did not mention appellant of his own accord, and it appears that Boyd did not accuse appellant even after the officer prompted him about the earlier "beef" appellant had with Boyd, the context in which this interview took place reasonably could have persuaded the jury that it was understandable that Boyd did not tell the whole story at that time. Officer Woodward interviewed Boyd less than an hour after he had sustained several serious bullet wounds.[20] To Officer Woodward, Boyd appeared "to be in pain, scared, kind of unsure of what was going to happen to him." Boyd testified that he did not re-

19. Because the relevance of the nondisclosure for present purposes turns on the prosecutor's knowing failure to disclose exculpatory information, not every failure to disclose *Brady* information will support an inference that the government considered that disclosure of the evidence would weaken its case, for example, in cases of negligent nondisclosure. *Cf. Brady,* 373 U.S. at 87, 83 S.Ct. 1194 (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

20. Boyd testified that he "couldn't move [his] arm," and that his "lung collapsed, [and he] had to get a blood transfusion." He later learned at the hospital that he "had nerve damage" because "[t]he bullet [had] bounced off [his] spine. . . ."

member what he told Officer Woodward because he was "dizzy, probably drugged ... had a lot of drugs ... wasn't very conscious of what was going on at the moment." But when Boyd had fully regained consciousness after surgery, he was then able to tell Detective Francis that appellant was the shooter. Due to Boyd's vulnerable physical and mental state at the time Officer Woodward interviewed him, the jury appears to have simply dismissed as relatively unimportant his initial failure to identify appellant. Moreover, Durham, who knew appellant from the neighborhood and was not significantly impeached, saw the shooting and identified appellant as the shooter. Therefore, it is difficult to conceive that it would have made much difference to the jury if it had known that the prosecutor in the first trial thought that Boyd's exculpatory statement at the hospital undercut the government's case, and for that reason failed to make a timely disclosure.[21]

## B. *Vouching*

■ Appellant contends that the trial court improperly permitted the government to use what he characterizes as "self-vouching" statements about the government's good faith in investigating the crime. The statements that appellant characterizes as "self-vouching" were posed during the prosecutor's cross-examination of Sharia Shelton, appellant's wife. In one question, for example, the prosecutor asked Mrs. Shelton whether the AUSA who prosecuted the first trial had asked her if she had "any information that would help your husband; isn't that right?"[22] Defense counsel objected to the question as eliciting hearsay. The trial court disagreed, saying that "[i]t's definitely not being admitted for the truth asserted, it's ... coming in ... to show bias." Defense counsel then asked for "an instruction that this is not to come in as being the truth." The trial court denied the request, saying "I haven't heard anything if it's true yet."

Appellant's argument that the statements implicit in the cross-examination interrogation were "self-vouching" is made for the first time on appeal. We therefore review this claim for plain error. We hold that the trial judge did not have an obligation to strike the prosecutor's questions *sua sponte*, or to give a limiting instruction restricting their use by the jury, as the questions merely sought to establish bias—that the witness had previously declined to relay allegedly exculpatory information to the government, even when she was invited to do so.

■ For the foregoing reasons, we affirm appellant's convictions. We agree with appellant (and the government concedes) that because the two convictions of

21. To the extent we take into account that there was a hung jury in the first trial, we cannot attribute it to doubt about Boyd's identification of appellant as the shooter, as that jury was not informed that Boyd did not identify appellant as the shooter when he was first interviewed at the hospital.

22. At another point the prosecutor asked:

Prosecutor: In fact, [the first prosecutor] told you that the last thing he wanted to do was to have the wrong person in jail; isn't that right?

Mrs. Shelton: He told me that but I didn't believe him, and especially don't believe him now since I found out that it is information that he withheld from my husband's lawyer that could have dismissed him and had him brought back home almost two years ago, like 15 months ago.

Prosecutor: Did you—

The Court: Ladies and gentlemen, disregard that last answer, it wasn't responsive.

possession of a firearm during a crime of violence arose from the "single violent act" of shooting Boyd, one count must be vacated. *See Nixon v. United States,* 730 A.2d 145, 153 (D.C.1999), *cert. denied* 528 U.S. 899, 120 S.Ct. 233, 145 L.Ed.2d 196 (1999).

For that sole purpose, we remand the case to the trial court.

*So ordered.*