DISTRICT OF COLUMBIA, Appellant,

v.

Gloria PEREZ, Appellee.

No. 95–CV–453.

District of Columbia Court of Appeals.

Argued Nov. 6, 1996.

Decided May 22, 1997.

that her complexion was "yellowish." Dr. Fales examined Rosa at the clinic that afternoon at 3:40 p.m. Hearing no fetal heartbeat and discovering no fetal growth since the previous visit, he suspected that her fetus had died. Dr. Fales also recorded Rosa's pale appearance.

Based on his examination, Dr. Fales ordered Rosa to report directly to D.C. General Hospital. He wrote down his order with the notation "Stat," meaning "immediately" and informed Nurse Bondurant that Rosa needed to go to the hospital right away. At the hospital, a sonogram could confirm in a matter of minutes whether Rosa's fetus had died. The hospital doctors could also perform medical tests to diagnose and treat Rosa's other symptoms.

Despite the order from Dr. Fales for immediate hospital testing on June 26, Nurse Bondurant gave Rosa a referral slip directing her to report to D.C. General Hospital the next day, June 27. Nurse Bondurant herself described Rosa's condition on June 26 as urgent but, nonetheless, personally decided to send Rosa home rather than to the hospital as Dr. Fales had ordered. She offered the explanation that she was unable to contact the hospital that afternoon for an immediate appointment because the clinic telephones were not working.

Shortly after leaving the clinic, Rosa visited the home of Hector Rodriguez, her boyfriend and the father of the baby. He testified that Rosa was in pain, very pale, vomiting, bony, and that "her skin was very yellow." Concerned about her condition, he took her home to rest until her hospital appointment that Nurse Bondurant had scheduled for the next day.

According to Gloria, by the morning of June 27, Rosa was also feverish and "very, very drained." Rosa nonetheless took a bus to D.C. General Hospital, where a sonogram clearly revealed at 7:41 a.m. that her fetus had died. The hospital staff, however, did

James C. McKay, Jr., Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, and Sidney R. Bixler, Assistant Corporation Counsel, were on the brief, for appellant.

Bruce J. Klores, Washington, DC, with whom Lesley Zork, Philip Ziperman and David Vega were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

Plaintiff Gloria Perez, aunt of decedent Rosa Perez, obtained a jury verdict against the District of Columbia awarding $850,000 in damages under the survival[1] and wrongful death[2] statutes. The District contends on appeal that it is entitled to judgment as a matter of law because Perez failed to establish a prima facie case of medical negligence. The District argues there was insufficient evidence at trial that it breached the standard of care or legally caused Rosa's death.[3] We hold that Perez presented legally sufficient evidence of the District's negligence and affirm the jury's verdict in her favor.

### I. Factual and Procedural History

In her eleventh week of pregnancy, eighteen-year-old Rosa Perez sought out prenatal care at the District's Adams Morgan Clinic. She began routine visits on April 18, 1991. During office visits on May 14 and May 28, a normal fetal heartbeat was audible.

Four weeks later, on June 26, Gloria observed that Rosa was "looking very bad" and

---

1. D.C.Code § 12–101 (1995) (cause of action in favor of decedent survives death of decedent).

2. D.C.Code § 16–2701 (1989) (cause of action in favor of close relatives for death of decedent).

3. The District contends alternatively that a new trial is warranted because the jury's verdict is against the great weight of the evidence. We disagree.

not admit her at this time for further testing and treatment; they instead sent Rosa back to the Adams Morgan Clinic to sign forms.

After Rosa took a taxicab back to the clinic to fill out papers, Hector and Gloria drove her back to the hospital. She was admitted to the emergency room at 11:23 a.m. while screaming. Hospital records indicate that Rosa was very pale, weak, nauseated, and unable to urinate, that she had been feverish that morning, and that she had been vomiting and jaundiced since the day before.

That afternoon the hospital doctors induced labor to deliver the fetus. Rosa's condition worsened rapidly, and she was transferred into intensive care, where she died later that night. An autopsy revealed that the cause of her death was fatty liver disease, a rare condition exacerbated by her pregnancy yet unrelated to the death of her fetus.

Gloria Perez subsequently filed a medical malpractice suit against the District setting forth dual causes of action under the survival and wrongful death statutes.[4] The jury awarded $650,000 on the survival action and $200,000 on the wrongful death action. The District then moved for judgment notwithstanding the verdict,[5] or for new trial, or for remittitur.[6] The District now appeals the trial court's denial of this motion.

## II. Legal Sufficiency of Plaintiff's Evidence

In her complaint, Perez premised the statutory claims on the theory that the District committed medical malpractice. It was, therefore, her burden at trial to present medical opinion testimony establishing that the District's substandard medical care legal-

ly caused Rosa's death. *See Lasley v. Georgetown Univ.*, 688 A.2d 1381 (D.C.1997) (requiring medical opinion testimony for medical malpractice claims); *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990) (citations omitted) (requiring evidence of the standard of care, a deviation from it, and a causal link between the deviation and the injury). The District claims that it is entitled to judgment as a matter of law because the evidence Perez presented at trial fails to establish that the District deviated from the standard of care or that the District's conduct legally caused Rosa's death.

On appeal, we review the trial evidence in the light most favorable to Perez and draw all reasonable inferences against the District. We shall not disturb the trial judge's ruling on a motion for judgment as a matter of law "[a]s long as there is some evidence from which jurors could find that the party has met its burden...." *Felix Alliegro v. ACandS, Inc.*, 691 A.2d 102, 105 (D.C.1997) (citations omitted). In assessing the legal sufficiency of the evidence, neither the appellate court nor the trial court may act as the trier of fact, and each must "take care to avoid weighing the evidence, passing on the credibility of the witnesses, or substituting [its] judgment for that of the jury." *Id.*

### A. Breach by the Adams Morgan Clinic

■ There was ample evidence at trial from which a reasonable jury could reasonably conclude that the District's employees at the Adams Morgan Clinic breached the standard of care. The medical experts agreed[7] that if a patient presents symptoms of sickness in addition to fetal death in utero, it is necessary to hospitalize the patient immedi-

---

4. Hector Rodriguez initially appended a second pair of survival and wrongful death claims on behalf of the unborn child. He voluntarily withdrew these claims, however, because the fetus was nonviable. *Cf. Greater Southeast Community Hosp. v. Williams*, 482 A.2d 394 (D.C.1984) (recognizing statutory causes of action for a viable fetus negligently harmed).

5. Under the older nomenclature, this motion was entitled "judgment non obstante veredicto," or "J.N.O.V.," or "judgment notwithstanding the verdict." In current parlance, we designate it a "renewed motion for judgment as a matter of law." Super.Ct.Civ.R. 50(b).

6. The amount of the damages award is uncontested on appeal.

7. The District's argument that plaintiff failed to prove a national standard of care is unpersuasive in light of the substantial agreement between plaintiff's expert witness, Dr. Berke, and the defense expert witness, Dr. King. *District of Columbia v. Howard*, 588 A.2d 683 (D.C.1991) (substantial agreement between experts can cure alleged defects in proof of a national standard).

ately for diagnosis and treatment. A jury could reasonably find that when Dr. Fales examined Rosa on June 26, she did present symptoms of sickness in addition to fetal death in utero.

The evidence indicates that she was visibly ill to her family throughout the day. Gloria testified that in the morning Rosa "was looking very bad" and her skin was "yellowish," and Hector testified that after the clinic visit, Rosa was in pain, very pale, vomiting, bony, and "her skin was very yellow." Furthermore, Dr. Berke testified that Rosa's symptoms were so severe the next day that "she had to look sick the day before. This is not something that came on her overnight. This has been progressing for probably several days." Finally, Dr. Fales himself recorded "looks pale" in Rosa's medical records. It is, therefore, reasonable for a jury to infer that Rosa presented symptoms of sickness in addition to fetal death in utero during the afternoon examination on June 26.[8]

Rather than hospitalize Rosa for diagnosis and treatment of her sickness, however, Dr. Fales merely ordered a sonogram test to confirm his conclusion that her fetus had died. Furthermore, Nurse Bondurant needlessly delayed the testing until the following day. The evidence of the clinic's deviation from the standard of care requiring immediate hospitalization is, therefore, legally sufficient.

### B. Breach by D.C. General Hospital

The failure of D.C. General Hospital to hospitalize Rosa immediately after the sonogram test constitutes a second basis for the District's negligence. According to Dr. Fales, once fetal death is confirmed, the standard of care requires the hospital to admit the patient immediately. Moreover, according to Drs. Berke and King, the hospital must also conform to the standard of care requiring immediate hospitalization of a patient who is sick in addition to presenting fetal death in utero. Rather than commencing immediate diagnosis and treatment, however, the hospital instead sent Rosa back to the Adams Morgan Clinic to fill out paperwork. The hospital, therefore, waited until 11:23 a.m. to admit Rosa into the emergency room. This evidence suffices to establish that D.C. General Hospital—in addition to the Adams Morgan Clinic—breached the standard of care.

### C. Causation

The District contends that even if it deviated from the standard of care, Perez failed to present evidence at trial sufficient to establish a causal link between the deviation and Rosa's death. Citing the *Palsgraf* and *Wagon Mound* cases,[9] the District argues that Rosa's death was legally unforeseeable

---

8. We note that the jury was entitled to resolve every factual issue against the District because Dr. Fales and Nurse Bondurant falsified Rosa's clinic records after learning of her death. As one scholar has noted:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979) (emphasis added to last sentence). During the questioning of Nurse Bondurant, the trial judge remarked as follows:

> I'm very concerned about the way they've changed the record. Frankly, I'm sitting here wondering whether I should make a referral to the United States Attorney's Office and ask them to investigate this whole situation. I'm extremely concerned that some of these people are perjuring themselves in front of this Court.... I'm very concerned about this whole situation. I can't tell you how serious I think it is.

Responding to the trial court's further inquiry, Nurse Bondurant admitted that she altered Rosa's appointment history records at the direction of Dr. Fales. He also admitted during his testimony that the altered records were inaccurate.

9. *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, J.); *Overseas Tankship (U.K.) Ltd. v. Morts Dock & Eng'g Co. (The Wagon Mound)*, [1961] 1 All E.R. 404, *reprinted in* 100 A.L.R.2d 928 (1965).

because fatty liver disease is so rare. This recasting of the question distorts the pertinent causation issue. Perez had the burden of establishing only that the District's failure to hospitalize Rosa immediately was a substantial factor in causing her death.

Perez easily satisfied this burden because Drs. Berke and King agreed that Rosa would likely still be alive had she been hospitalized on June 26 rather than June 27. The evidence shows that even though fatty liver disease is rare, immediate testing would easily have detected it, and immediate treatment could have saved her. Dr. Berke explained that fatty liver disease is related to pregnancy, so the degenerative process could have been successfully reversed simply by inducing labor and delivering the fetus. He also testified that even at the time of the sonogram testing on the morning of June 27, there still existed reasonable prospects that such treatment would be successful. In his medical opinion, waiting until the afternoon "destroyed the last hope of saving her life." We conclude, therefore, that the evidence of causation was clearly sufficient, whether considered in conjunction with the breach by the Adams Morgan Clinic or the breach by D.C. General Hospital.

Perez adduced evidence at trial legally sufficient to support the jury's verdict that the District of Columbia committed medical negligence. We, therefore, affirm the judgment.

*Affirmed.*