**Arnell W. SHELTON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CF–1197.

District of Columbia Court of Appeals.

Argued Oct. 3, 2007.*

Decided Nov. 12, 2009.

Amended July 14, 2011.

* Following oral argument the court *sua sponte* ordered the parties to file supplemental briefs.

Sandra K. Levick, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Sharon A. Sprague, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III and Wanda Dixon, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, Associate Judge, and SCHWELB and KING, Senior Judges.

1. D.C.Code §§ 22–401, –4502 (2001).

2. D.C.Code §§ 22–404.01, –4502 (2001).

3. D.C.Code § 22–4504(b) (2001).

4. D.C.Code § 22–4504(a) (2001).

PER CURIAM:

Appellant, Arnell W. Shelton, was found guilty by a jury of assault with intent to kill while armed,[1] aggravated assault while armed,[2] two counts of possession of a firearm during a crime of violence,[3] carrying a pistol without a license,[4] and malicious destruction of property.[5] Appellant's principal claim is that the trial judge did not allow him to introduce evidence of the fact that the government had withheld exculpatory statements made by the complainant during his first trial,[6] evidence that the prosecutor did not disclose until the eve of the second trial. Appellant contends that with that evidence, he could have argued to the jury that in the government's own view the case against appellant was not as strong as the government purported it to be. The government argues, however, that we should reject that contention because it was not presented to the trial judge and because it lacked substantial merit. We decline to decide whether the claim was meritorious or whether it was properly preserved because, assuming, without deciding, that the trial judge erred in excluding that evidence and argument, any such error was harmless. We therefore affirm.

## I. Facts

The government presented evidence that at around 11:00 p.m. on January 14, 2001, Christopher Boyd drove to Melon Street, Southeast, to visit his mother. Boyd stopped in front of her house, where he planned to double-park, and saw his mother standing outside talking to neighbors. Suddenly, a blue "foreign make

5. D.C.Code § 22–303 (2001).

6. The first trial, held in March 2002, ended in a mistrial because the jury was unable to reach a unanimous verdict. Judge Weisberg presided over the first trial as well.

Toyota" raced up along the left side of Boyd's car. Boyd saw appellant "hanging out the window" of the Toyota, and he soon "was struck by a bullet." [7] Boyd testified that he heard the shots and saw the "fire from the gun." [8] When Boyd tried to drive away, the car that was carrying appellant continued to stay next to him as he traveled down the street. Boyd eventually escaped by turning down an alley.

Boyd drove himself to Greater Southeast Hospital, and passed out. Boyd testified that he was "in and out of consciousness" while at the hospital, and "didn't really know what was going on at the time." Boyd "remember[ed] waking up and a police officer [was] in front of [him]," but did not remember having a "conscious conversation" with the officer (Officer Edward Woodward). Boyd was soon transferred to the Intensive Care Unit at Washington Hospital Center for emergency treatment.

Two days after the shooting, Boyd was interviewed by Detective James V. Francis at Washington Hospital Center. Detective Francis asked Boyd if he knew the identity of the person who shot him, to which Boyd unhesitatingly responded: "Arnell White Boy shot me." Boyd further stated that he had known "Arnell White Bay" [i.e., appellant] for more than five years, and

that appellant was the person who had fired the shots from the front passenger seat of the blue Toyota. Boyd again confirmed appellant's identity when Detective Francis showed him a photo of appellant.

Andrew Durham saw the shooting. He knew appellant and Boyd from the neighborhood, but was not close to either one of them. Durham testified that he saw Boyd "pull[ ] up and ... talk[ ] to some guys in front of his mother's house." A couple of minutes later, a "small little Nissan or Honda, ... a small four-door car with tinted windows" drove up beside Boyd's car. Durham heard gunshots and saw that Boyd was being shot as he sat in his car. The shooter's car then continued past Boyd's car, and Durham saw the shooter "lift his head up and look out the window." [9] Durham recognized appellant as the shooter. He then watched appellant fire additional shots at Boyd as the two cars drove away.

Boyd and his "play cousin," Myra Ferguson, testified about the events that likely precipitated the shooting.[10] In April 2000, about ten months before Boyd was shot, Ferguson had accepted a ride home from appellant, whom she knew from the neighborhood. While they were in the car, appellant tried to kiss and fondle her and to unzip her pants, ripping her underwear in

---

**7.** Boyd had been seated in the driver's seat of his car, which had tinted windows that were rolled up. He testified that he had been looking backwards over his left shoulder when the car carrying appellant approached. Boyd saw appellant's face as appellant reached out of the front passenger-side window of the blue Toyota, holding his two arms together, fully extended. Boyd stated that he was certain appellant was the shooter. Although Boyd admitted that he drank a "small portion" of vodka en route to Melon Street, he was confident that he was not intoxicated or "tipsy" and that the drink had not impaired his ability to perceive the identity of the shooter.

**8.** Appellant was about two feet away from Boyd when he fired the shots.

**9.** Durham testified that at first he could not see the shooter's face because he was then looking through the tinted windows of both cars. Once the shooter's car stared to pull away, Durham had a better view and was able to see the shooter's "whole face" and his arm from the elbow down. Durham identified appellant in court as the shooter.

**10.** Ferguson stated that she and her brother, Derrick Ferguson, were "like family" to Boyd. She was sixteen years old at the time of the shooting.

the process. When appellant continued the assault after Ferguson told him to stop, she hit him in the groin, got out of the car, and walked home. Ferguson did not tell anyone about this incident because she was "embarrassed about the whole situation" and "really [didn't] want anyone to know about it."

A couple of weeks later, Boyd learned of appellant's sexual assault when appellant talked about it at a party. Boyd eventually told Ferguson's brother, Derrick, about the incident. Derrick was upset and decided to look for appellant. Derrick Ferguson soon found appellant standing outside on Newcomb Street and confronted him, accompanied by his sister and Boyd. Derrick and appellant started fighting. Appellant then ran inside a building, at which point Derrick Ferguson began "busting [appellant's] car windows out of his car." Neither Boyd nor Myra Ferguson helped damage appellant's car.

Officer Edward Woodward, who had been one of the first officers on the scene after the January 2001 shooting, testified on behalf of appellant at trial. Officer Woodward had also interviewed Boyd at Greater Southeast Hospital approximately 45 minutes after the shooting. During that interview, Boyd did not tell the officer that he had seen or recognized who shot him. Officer Woodward could not remember Boyd's "exact words, if he said I don't know or I didn't see or all's I saw was ... someone shoot at me from a from a dark-colored car." Officer Woodward also asked Boyd "if he had a beef with [appellant] earlier in the summer." [11] According to Officer Woodward, Boyd responded that there had been a dispute and that it pertained to "an unwanted sexual advance on

one of [Boyd's] cousins." Boyd did not, however, state that appellant had also been the one who shot him. Officer Woodward further testified that Boyd "appeared to be in pain, scared, kind of unsure of what was going to happen to him" during the interview.

Appellant presented an alibi defense through the testimony of his wife, Sharia Shelton, who said that appellant had been with her and their seven-month-old daughter watching TV on that Sunday night—a "family day" at their home—when the shooting took place. The prosecutor cross-examined Ms. Shelton and sought to impeach her as biased, because she had refused to tell the prosecutor in the first trial about the alibi after he had called her for any information that could exonerate her husband.

The prosecutor argued in closing that appellant wanted "revenge" because "Christopher Boyd caused him to be shamed and publicly humiliated." The government's theory was that appellant viewed Boyd as the instigator, "set[ting] into motion th[e] chain of events," that led Derrick Ferguson to beat appellant and bash his car in public.

## II. *Brady* Violation

Neither before nor during appellant's first trial, see note 6, *supra*, was defense counsel informed that Boyd had failed to identify appellant as the shooter when he was questioned at the hospital, and that Officer Woodward had brought up the "beef" Boyd had with appellant several months earlier. Indeed, this information was not disclosed until the eve of the second trial, by Assistant United States Attorney ("AUSA") Wanda Dixon, who

11. It is unclear how Officer Woodward knew about the fight between Derrick Ferguson and appellant. At oral argument, the government represented to the court that the officer might have obtained such information through contacts developed through the Metropolitan Police Department's community policing.

had replaced AUSA Andrew Kline, the prosecutor who represented the United States during the first trial. Defense counsel informed the trial court of the late disclosure, argued that it was a *Brady* violation,[12] and requested that the case be dismissed. Upon being apprised of the situation, the trial court provided the parties with "a chance to find out … as much as [possible]" about "where this information [came] from, when it came to the United States Attorney's Office, why it wasn't disclosed earlier."

The following day, the trial judge questioned the prosecutor:

**The Court:** But I still don't understand why [defense counsel] did not get [this information] before we went to trial the first time.

**Prosecutor:** Your Honor, it was [the former prosecutor's] position that the information was not exculpatory.

**The Court:** Do you want to explain his rationale (indiscernible)?

. . . .

**Prosecutor:** My understanding is that [the former prosecutor's] position was based on the thought that there was a reason for the witness to respond in that way. The reason being that the witness was in pain. He had just been taken to the hospital. He was on a gurney, staff attending to him, etc. Your Honor, and if I may also approach the bench ex parte, I have something else I can tell the Court.

(*Ex parte* bench conference with the Government attorney, Ms. Dixon, which was indiscernible.) [13]

(Open court.)

**The Court:** When I said I don't get the first thing, what I meant was [that] given the prosecutor's obligations under *Brady v. Maryland,* I don't see how a prosecutor who states that if a witness says I don't know who shot me or I didn't see who shot me or all I saw was a dark car, who's later going to come into court and say Arnell Shelton shot me, I saw it, saw him, should not turn that over because the prosecutor doesn't think it's true.

**Prosecutor:** Yes, Your Honor, and I'm not saying that that's my position at all.

**The Court:** Well, *I mean, I don't see how any prosecutor could take that position. . . . I don't see how any prosecutor anywhere in any state in the country, could say that I don't have to turn that over because I think I know why he said that.*

. . . .

**The Court:** *[I]t wouldn't have taken me five seconds to figure out that that's something that the defense was entitled to know.*

(Emphasis added.)

The trial judge was "strongly disinclined" to grant (and eventually rejected) the motion to dismiss the case as a "punitive sanction for the failure to turn over" Boyd's exculpatory statement, but offered to continue the trial date if defense counsel

---

12. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194.

13. The *ex parte* bench conference between the prosecutor and the trial judge was not transcribed, because the recording was "indiscernible." Appellant's counsel asked the government and the court to try to reconstruct the bench conference for purposes of appeal. These efforts were unsuccessful. Neither the judge nor the prosecutor remembered what had transpired.

needed additional time to prepare. Counsel stated that she was ready, and declined the offer for a continuance. At trial, defense counsel called Officer Woodward as a witness. After defense counsel elicited the substance of Boyd's statements from when Officer Woodward interviewed him at the hospital, in cross-examination the government stressed the ambiguities and vagueness of what the officer recalled. On redirect, defense counsel tried to question Officer Woodward about the late disclosure of the exculpatory statement Boyd had made:

> **Defense Counsel:** Officer Woodward, when was the first time you came forward and told us what you knew? [14]
>
> **Prosecutor:** Objection.
>
> **The Court:** Who's the us and—
>
> **Defense Counsel:** When you spoke to myself and my investigator what you knew?
>
> **Prosecutor:** Objection, relevance.
>
> **The Court:** I'll sustain the objection.
>
> **Defense Counsel:** Well, Detective, I mean Officer Woodward, it's fair to say you spoke to me the other day, correct?
>
> **Officer Woodward:** Yes.
>
> **Prosecutor:** Objection.
>
> **The Court:** Wait a minute, I will ask you to come to the bench at this point. (Bench conference.)
>
> **The Court:** I think I'm going to cut this one off, Miss Rodriques, if you're going where I think you're going. What are you up to?
>
> **Defense Counsel:** I'm going to remind him about what he told us.
>
> **The Court:** I don't have any problem with that, ... but the implication that he's never told anybody is not proper.
>
> **Defense Counsel:** Implication.
>
> **The Court:** I don't want you to go[ ] into what he told [the first prosecutor], why [he] didn't tell you, the jury's not going to hear that.
>
> **Defense Counsel:** Well, where I did want to go, Your Honor, the Government never told us until two days ago.
>
> **The Court:** No.
>
> **Defense Counsel:** Playing dirty.
>
> **The Court:** Remedy for that was as much time as you needed to prepare for it and you said you were ready, that's it, *there's no other sanction* you're going to get for [late] disclosure and—
>
> **Defense Counsel:** So the court's ruling is that the jury won't hear this?
>
> **The Court:** Correct.
>
> (Close bench conference.)

(Emphasis added.)

## III. Analysis

### A. *Admission by Conduct*

■ Appellant argues on appeal that the trial judge improperly prevented defense counsel from questioning Officer Woodward further in order to bring to the jury's attention the government's eleventh-hour disclosure, on the eve of the second trial, that when Officer Woodward first interviewed Boyd at the hospital, Boyd had not identified appellant as the shooter. From this nondisclosure, appellant argues, the jury could have inferred that the government (during the first trial) was concerned that the exculpatory evidence seriously undermined its case. This was not just a reasonable and permissible inference, appellant contends, but a powerful one, because, as the trial court commented, there was no question that the government

14. The day before the second trial was set to start, the prosecutor informed defense counsel about Officer Woodward's interview with Boyd. Defense counsel then interviewed Officer Woodward.

had an obligation to reveal it to the defense before the first trial. That the government so clearly breached its *Brady* obligation to disclose the information reflects the importance attached to it.

The government contends that we are limited to review for plain error, because appellant is challenging the trial court's ruling on grounds that were not asserted at trial. *See, e.g., Watts v. United States,* 971 A.2d 921, 930 (D.C.2009) (citing *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). According to the government, although defense counsel asked the trial court to admit into evidence the government's failure to disclose the exculpatory statements, appellant did not preserve the specific claim he makes on appeal-that he wanted to introduce evidence of the government's withholding of exculpatory evidence to prove admission by conduct. Appellant, on the other hand, argues that his claim was properly preserved, even if not made with the precision of the argument it has presented on appeal, citing *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), and a number of our cases that have applied it. Specifically, appellant contends that by saying "playing dirty" after the judge sustained the government's objection based on relevance, defense counsel let the trial court know (albeit in a short-hand way) that the evidence was relevant because the prosecutor's failure to disclose exculpatory evidence showed that the government knew that its case against appellant was weak. That proposed inference, however, was never fully explained to the trial judge. We need not decide, however, whether the claim was adequately preserved because, assuming, without deciding, that the trial court erred in excluding the evidence and precluding counsel from arguing its relevance to the jury, we conclude that the error was harmless.

We do not reverse convictions in order to punish prosecutors, *see United States v. Hasting,* 461 U.S. 499, 506–7, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), but to remedy prejudice resulting from the trial court's error in excluding evidence of the prosecutor's nondisclosure that was probative of the questions that were presented to the jury for decision.

Here, even if the court had allowed evidence of the government's *Brady* violation to come in, and defense counsel had argued to the jury that the government withheld the evidence because it thought its case was weak, we can conclude, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Although appellant was unable to present evidence that at the first trial the government had failed to disclose Boyd's interview with Officer Woodward, and to argue to the jury that the government had done so because it considered that the revelation would seriously undermine the prosecution, the fact remains that by the close of the second trial, the jury was presented with the substantive evidence that Boyd had initially failed to identify appellant at the hospital. Ultimately, the jury rejected that evidence as not dispositive on the issue of identification. It is not difficult to see why. Boyd's statement at the hospital was recounted in Officer Woodward's testimony, which, due to its ambiguity, did not have much force:

**Defense Counsel:** Did [Boyd] tell you I don't know who shot me ...?

**Officer Woodward:** I'm not sure of his exact words, if he said I don't know or I didn't see or all's I saw was a dark

colored, someone shoot at me from a dark-colored car.

Although Officer Woodward later testified that Boyd did not mention appellant of his own accord, and it appears that Boyd did not accuse appellant even after the officer prompted him about the earlier "beef" appellant had with Boyd, the context in which this interview took place reasonably could have persuaded the jury that it was understandable that Boyd did not tell the whole story at that time. Officer Woodward interviewed Boyd less than an hour after he had sustained several serious bullet wounds.[15] To Officer Woodward, Boyd appeared "to be in pain, scared, kind of unsure of what was going to happen to him." Boyd testified that he did not remember what he told Officer Woodward because he was "dizzy, probably drugged ... had a lot of drugs ... wasn't very conscious of what was going on at the moment." But when Boyd had fully regained consciousness after surgery, he was then able to tell Detective Francis that appellant was the shooter. Due to Boyd's vulnerable physical and mental state at the time Officer Woodward interviewed him, the jury appears to have simply dismissed as relatively unimportant his initial failure to identify appellant. Moreover, Durham, who knew appellant from the neighborhood and was not significantly impeached, saw the shooting and identified appellant as the shooter. Therefore, it is difficult to conceive that it would have made much difference to the jury if it had known that the prosecutor in the first trial thought that Boyd's exculpatory statement at the hospital undercut the government's case, and for that reason failed to make a timely disclosure.[16]

### B. *Vouching*

■■ Appellant contends that the trial court improperly permitted the government to use what he characterizes as "self-vouching" statements about the government's good faith in investigating the crime. The statements that appellant characterizes as "self-vouching" were posed during the prosecutor's cross-examination of Sharia Shelton, appellant's wife. In one question, for example, the prosecutor asked Mrs. Shelton whether the AUSA who prosecuted the first trial had asked her if she had "any information that would help your husband; isn't that right?"[17] Defense counsel objected to the question as eliciting hearsay. The trial court disagreed, saying that "[i]t's definitely not being admitted for the truth asserted, it's ... coming in ... to show bias." Defense counsel then asked for "an instruction that this is not to come in as being the truth."

---

15. Boyd testified that he "couldn't move [his] arm," and that his "lung collapsed, [and he] had to get a blood transfusion." He later learned at the hospital that he "had nerve damage" because "[t]he bullet [had] bounced off [his] spine...."

16. To the extent we take into account that there was a hung jury in the first trial, we cannot attribute it to doubt about Boyd's identification of appellant as the shooter, as that jury was not informed that Boyd did not identify appellant as the shooter when he was first interviewed at the hospital.

17. At another point the prosecutor asked:

Prosecutor: In fact, [the first prosecutor] told you that the last thing he wanted to do was to have the wrong person in jail; isn't that right?

Mrs. Shelton: He told me that but I didn't believe him, and especially don't believe him now since I found out that it is information that he withheld from my husband's lawyer that could have dismissed him and had him brought back home almost two years ago, like 15 months ago.

Prosecutor: Did you—

The Court: Ladies and gentlemen, disregard that last answer, it wasn't responsive.

The trial court denied the request, saying "I haven't heard anything if it's true yet."

Appellant's argument that the statements implicit in the cross-examination interrogation were "self-vouching" is made for the first time on appeal. We therefore review this claim for plain error. We hold that the trial judge did not have an obligation to strike the prosecutor's questions *sua sponte*, or to give a limiting instruction restricting their use by the jury, as the questions merely sought to establish bias—that the witness had previously declined to relay allegedly exculpatory information to the government, even when she was invited to do so.

 For the foregoing reasons, we affirm appellant's convictions. We agree with appellant (and the government concedes) that because the two convictions of possession of a firearm during a crime of violence arose from the "single violent act" of shooting Boyd, one count must be vacated. *See Nixon v. United States,* 730 A.2d 145, 153 (D.C.1999), *cert. denied* 528 U.S. 899, 120 S.Ct. 233, 145 L.Ed.2d 196 (1999). For that sole purpose, we remand the case to the trial court.

*So ordered.*

RUIZ, Associate Judge, concurring in the disposition.

I dissent from my colleagues' decision to grant the government's petition for rehearing by vacating the division opinion, *Shelton v. United States,* 983 A.2d 363 (D.C.2009) ("*Shelton I* "), and issuing only part of it as an amended opinion. For the reasons that follow, I adhere to the reasoning, expressed in *Shelton I,* that there is evidentiary relevance to a prosecutor's purposeful failure to disclose exculpatory evidence and that, in an appropriate case, the defense should be able to introduce that evidence and comment upon it in closing.

## I.

As *Shelton I* explained, the foundation for the evidentiary relevance of an inference of "weakness of the case" flows from a closely analogous premise we accept without question: when a party has evidence that is relevant to the matter before the factfinder and does not present it at trial or destroys it so as to keep it from the opponent and factfinder, there is a reasonable inference that the evidence would undermine its case. We recognize and apply this inference in civil trials against the government as well as private litigants. *See id.* at 370. We apply it in criminal trials in the form of missing evidence and missing witness instructions. *See id.* Other courts have applied the same reasoning in permitting an inference adverse to the government in criminal trials specifically with respect to the suppression of evidence. *See id.* at 369–71. I submit that the inference is even stronger than a missing witness or missing evidence instruction if it can be shown that the government not only failed to present relevant evidence to the jury in a criminal trial, but intentionally withheld evidence from the defense that it had an *obligation* to disclose. For this reason I disagree with my colleagues on division that this appeal presents a "difficult question of first impression." In this case, the trial court excluded the evidence on grounds of relevance.[1] The trial court erred, as a matter of law, because it failed to recognize the validity of an inference that properly called into question the strength of the government's case. The Supreme

---

1. **Prosecutor:** Objection, relevance.
 **Court:** I'll sustain the objection.

*Shelton I,* 983 A.2d at 368

Court has recognized the validity of an adverse inference against the government arising from "slovenly" police work. *Kyles v. Whitley*, 514 U.S. 419, 446 n. 15, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (noting that "conscientious police work will enhance probative force and slovenly work will diminish it"). A similar inference is permissible when the government fails to disclose exculpatory evidence that it was required to disclose: that the prosecutor thought the withheld evidence would weaken the government's case. Therefore, a straightforward application of well-established principles dictates that evidence that the prosecutor intentionally withheld the evidence is relevant. *See generally* Cynthia E. Jones, *A Reason to Doubt: The Suppression of Evidence and the Inference of Innocence*, 100 J.Crim. L. & Criminology 415 (2010).

To be clear, I continue to believe that Shelton's convictions should not be reversed, for the reasons expressed in *Shelton I*, which the division incorporates in full in the amended opinion. I therefore concur in the court's judgment to affirm. That is no reason, in my view, to shy away from deciding the principal legal question presented in the appeal. Although an appellate court *need not* decide a question if it can otherwise dispose of the appeal, a court *may* do so in an appropriate case. The question is when is it appropriate to exercise that discretion. I believe this is such a case. The question presented is purely one of law. That it has not previously been addressed by this court is no reason to abstain where resolution of the legal issue flows easily from established principles of relevance and yet appears not to be well understood. At trial, the issue was erroneously construed by the court as

a matter of sanction for a *Brady* violation rather than understood as a request to introduce evidence of the government's nondisclosure because of its independent evidentiary relevance. Addressing that misconception lay at the analytical core of *Shelton I*. By deleting that analysis from the amended opinion, without addressing the arguments in the government's petition for rehearing, the court leaves the legal issue in doubt. Because I believe that a clear explanation of the relevant legal principles by the appellate court is appropriate and would be useful to the bench and bar, I include the analysis from *Shelton I* as an Appendix to this concurrence. In the following sections I respond to the arguments in the petition for rehearing.

## II.

To recap, the issue is whether, as a matter of law, a reasonable inference can be drawn from the government's withholding of exculpatory evidence that the government thought the evidence weakened its case. For that to be the case, the government's failure to disclose cannot be merely accidental or negligent; *purposeful* withholding in the face of a known obligation to disclose is required. *Shelton I*, 983 A.2d at 372 & n. 19 (noting that nondisclosure must be "knowing" and that negligent nondisclosure will not suffice). In its petition for rehearing, the government argues that to support the inference, the nondisclosure must have been in "bad faith," but that assertion is not supported by the cases and the government does not define what would constitute bad faith for this purpose.[2]

---

2. The government takes issue with *Shelton I*'s use of the word "knowing," and argues that the prosecutor "acted 'knowingly' in the sense that he was aware of the information and decided not to communicate it." However, that is not the common understanding of "knowing" when important obligations and rights with consequences are at stake. *See*

Although bad faith will surely suffice to permit an adverse inference against the government, it is not necessary to permit the consciousness-of-weakness-of-case inference the defense wished to argue in this case. Bad faith is at one extreme end of a continuum that describes misconduct. It is indisputable that the closer a prosecutor's action is to bad faith, the stronger the inference that the prosecutor had a powerful motive to withhold exculpatory evidence. Whether a prosecutor's nondisclosure is characterized as bad faith, however, the significant fact is whether the prosecutor *purposely* withheld exculpatory evidence he knew should be disclosed to the defense because that is what forms the evidentiary basis from which the factfinder can draw an inference that the prosecutor thought that the government's case would be weakened if the evidence were disclosed.[3] In this context, it is particularly significant that the prosecutor knew that he had an *obligation* to disclose exculpatory evidence because it adds to the intentionality of the nondisclosure and, consequently, to the force of the inference that the prosecutor must have had a reason related to the prosecution for failing to disclose. The inference is a strong one because so much is at stake: failure to disclose exculpatory evidence could delay the trial, result in a mistrial and imperil any conviction on appeal. At a personal level, a prosecutor would be risking an internal investigation and administrative sanction for violating government policy and discipline for ethical violations. In short, in light of the importance of the obligation to disclose exculpatory evidence and the serious consequences that can follow from breach of that obligation, it is reasonably inferrable that a prosecutor who intentionally withholds exculpatory evidence does not do so without reason but, rather, likely does so in order to improve the chances for successful prosecution.

The rehearing petition asserts that even if a "consciousness of weakness of the case" inference were legally permissible, the facts of this particular case did not warrant such an inference because the trial court made no individualized finding that the prosecutor in the first trial (the one who did not disclose the exculpatory evidence) had acted intentionally or, as the government would have it, in bad faith. That argument rings hollow, because if that had been the government's alternative position before the division, it would have requested a remand of the record so that the court could make the necessary findings. It did not. Moreover, the record before the court does not support that any further fact-finding was required or that *Shelton I* misinterpreted the import of the trial court's statements. The trial judge could not have been more adamant in re-

BLACK'S LAW DICTIONARY 950 (9th ed.2009) ("knowing, adj., 1. Having or showing awareness or understanding; well-informed (a knowing waiver of the right to counsel) 2. Deliberate; conscious (a knowing attempt to commit fraud)."). In any event, lest there be any misunderstanding, *Shelton I*'s use of "knowing" connotes the notion that the prosecutor knew he had exculpatory evidence he was supposed to disclose and chose not to do so.

3. It could be argued that bad faith might indicate a different reason for the prosecutor's nondisclosure, such as personal animus against opposing counsel, or a misplaced sense of prosecutorial zeal and competitiveness, that sheds less light on the prosecutor's consciousness of the weakness of the government's case. Where there are alternative reasonable inferences, it is for the factfinder to decide which one to believe. The trial court retains discretion, however, to evaluate whether the existence of a number of equally plausible inferences makes any one of them so weak as to lack significant probative value.

jecting the government's explanation (some of it proffered in an *ex parte* bench conference) that the prosecutor in the first trial had honestly—but mistakenly—thought the evidence was not truly exculpatory. Indeed, the government appears to have presented only a weak pro forma defense of the first prosecutor's actions, and with good reason. It bears reminding that the evidence at issue was that a witness central to the government's case—Boyd, the victim of the shooting, who knew appellant—had failed to identify him as the assailant at the hospital immediately after the assault, even though the investigating officer suggested appellant's name, implying that he was a possible suspect because he and Boyd had a "beef." The trial court rejected an offer to "hear from" the first prosecutor, stating that it would not have taken the court "five seconds to figure out that [Boyd's initial failure to identify appellant—an acquaintance—as the shooter is] something that the defense was entitled to know." 983 A.2d at 367. Relying on the trial court's further statement that "any prosecutor anywhere in any state in the country" would have known that the evidence was exculpatory and had to be disclosed to the defense, the division in *Shelton I* properly concluded that the trial court had implicitly found that the first prosecutor engaged in "*deliberate* nondisclosure." *Id.* at 372 (emphasis added).

*Shelton I's* reliance on the trial court's determination was sound both as a matter of law and as a matter of fact. As a matter of law, we are bound to defer to the trial court's findings unless they are clearly erroneous or not supported by the evidence. The trial judge, in turn, was entitled to rely on the presumption that attorneys engaged in criminal practice are aware of *Brady's* well-known requirement to disclose exculpatory evidence. *See Cone v. Bell,* —— U.S. ——, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009) (noting that "favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" (internal quotations omitted)). This presumption is particularly apt in the case of federal prosecutors. The prosecutors employed by the Office of the United States Attorney are a competitively selected and highly trained corps of litigators. Not surprisingly, the prosecutor in the second trial assured the judge that she did not concur "at all" with what she conceded had been her colleagues's erroneous assessment of the exculpatory nature of the evidence in the first trial, *Shelton I,* 983 A.2d at 367, further strengthening the court's assessment that the first prosecutor was well aware of his disclosure obligations. In the petition for rehearing, the government further assures the court that "it is the policy of our Office and the Department of Justice to disclose information of this type." The court is entitled to assume that prosecutors know not only what the law requires but also the obligations imposed by policies of the Department of Justice and of the Office of the United States Attorney for the District of Columbia.[4] When a prosecutor acts in clear violation of those obligations, a court may reasonably reject the claim that the failure to disclose was an "honest mistake of judgment" and determine, instead, that it crossed the line into knowing and intentional conduct. *See* note 2, *supra. Cf. Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (holding that bad faith

---

**4.** These policies are known and relied upon by this court. *See Miller v. United States,* 14 A.3d 1094, 1108–09 & nn. 16–17 (D.C.2011).

will be implied for purposes of establishing due process violation where police destroy materially exculpatory evidence; but there must be a showing of bad faith where evidence is only potentially exculpatory). The burden to rebut that presumption is properly placed on the government, and the trial court here obviously did not buy the government's proffered benign explanation for the nondisclosure. The repeated attempt in the petition for rehearing to convince this court otherwise is an unpersuasive request that the appellate court second-guess the trial court's determination.

The thrust of the petition for rehearing is not to deny the logic of the weakness-of-the-case inference where warranted by the facts, but to argue that it should not be drawn against the government. But why should there be a special rule when it is the government that hides the ball? Analogizing the government to an individual defendant, the petition for rehearing argues that, even if a prosecutor intentionally violates the government's disclosure obligation, and a consciousness-of-the-weakness-of-the-case inference would be reasonable with respect to that prosecutor, it is not fair to ascribe the prosecutor's misfeasance to the government and draw an inference against the government's case. According to the petition, the prosecutor is "merely a *lawyer* for a party, and any inferences to be drawn from a lawyer's actions about a *party's* state of mind are more attenuated." The government's argument is unsupported by case authority, and courts regularly impute to parties the consequences of their lawyers' actions. Moreover, the analogy to an individual is inapposite because the government is not a person and it can act only through agents. In the realm of the affirmative obligation to preserve and disclose exculpatory evidence to the defense, the responsibility to discharge the government's

obligation is entrusted to and exercised by its legal representatives, in this case the federal prosecutors. *See Kyles,* 514 U.S. at 437, 115 S.Ct. 1555. In those situations where one prosecutor intentionally withholds evidence in one trial and another discloses it at a second trial, as happened here, that fact goes to the strength of the inference and not to the relevance *vel non* of the evidence that permits the inference. It is a factor that would properly be taken into account by the trial judge in weighing the probative value of the evidence against potential prejudice. But in most cases, there is only one trial, and the belated disclosure will have been made by the same prosecution team that presents the case to the jury; or the disclosure might not be made at all, as when the defense becomes aware from some other source that the government has exculpatory evidence.

## III.

The final objection in the petition for rehearing is that *Shelton I* trenched on the trial court's prerogative to weigh the evidence's probative value against potential prejudice. Specifically, the argument is that in concluding that the trial court committed "legal error" in precluding defense counsel from introducing evidence of the first prosecutor's intentional nondisclosure of exculpatory evidence, the court "effectively conclud[ed] that [the trial judge] was obliged as a matter of law to find the evidence relevant and not substantially more prejudicial than probative." But *Shelton I* did no such thing because the trial court did not exclude the evidence based on weighing its probative value against potential prejudice. The trial court did not engage in that discretionary exercise because it did not apprehend the relevance of the evidence that the defense asked to be permitted to introduce, consid-

ering it only through the lens of a *Brady* sanction. It is well established that the failure to exercise discretion because the court does not recognize that it has to make a discretionary call, is itself an abuse of discretion. *Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). It was the trial court's failure to apprehend and deal with that fundamental point of evidentiary relevance that constituted "legal error" in the court's handling of the defense request to present evidence that the government intentionally withheld exculpatory evidence, and, based on that nondisclosure, urge the jury to draw an inference adverse to the government's case.

For the foregoing reasons, I dissent from the decision to grant the petition for rehearing and amend *Shelton I.* I file this concurrence with the purpose that in a future trial where the defense makes a similar request, it will be recognized as an issue that requires the exercise of discretion on the basis of principles of the law of evidence, not *Brady* sanction. That discretion entails deciding whether the facts would warrant the inference the defense seeks to argue to the jury, and whether the probative value of the inference is substantially outweighed by the potential for prejudice of presenting the relevant evidence in a given case.[5]

# APPENDIX

(Because Judge Ruiz dissents from the decision to amend the opinion and adheres to the original opinion in full, the section of *Shelton I* that has been deleted from the amended opinion is incorporated here as an appendix to her concurrence.)

*Shelton v. United States,* 983 A.2d 363, 368–72 (D.C.2009)

## A. Admission by Conduct

Appellant argues on appeal that the trial judge improperly prevented defense counsel from questioning Officer Woodward further in order to bring to the jury's attention the government's eleventh-hour disclosure, on the eve of the second trial, that when Officer Woodward first interviewed Boyd at the hospital, Boyd had not identified appellant as the shooter. From this nondisclosure, appellant argues, the jury could have inferred that the government (during the first trial) was concerned that the exculpatory evidence seriously undermined its case. This was not just a reasonable and permissible inference, appellant contends, but a powerful one, because, as the trial court commented, there was no question that the government had an obligation to reveal it to the defense before the first trial. That the govern-

---

5. On a final note, the petition for rehearing points to "ramifications" that could result if the defense is permitted to present evidence that the government purposely withheld exculpatory evidence from the defense. But none of these ramifications is beyond the scope of the trial court's authority and ability to consider and manage. The prejudice that could properly be considered is the potential for jury confusion, unnecessary delay and complication of a trial-within-a-trial, and the possibility that the prosecutor in the trial will be called upon to testify about the reason for not disclosing exculpatory evidence, possibly necessitating a change in the government's prosecution team. These are valid considerations for the judge and they could prevail if they "substantially outweigh" the probative force of the inference in a particular case. These considerations, however, do not invalidate the weakness-of-the-case inference, where one may reasonably be drawn from the evidence, nor are they to be invoked as a mantra to exclude relevant evidence. Rather, they are to be carefully assessed in light of the defendant's right to present a defense. Court-tailored guidelines to minimize prejudice is preferable to outright exclusion of probative evidence. The potential to prejudice the government's *case* in the eyes of the jury, however, is not undue prejudice; it is precisely the evidentiary point that the defense is permitted to make. *See Kyles,* 514 U.S. at 446 n. 15, 115 S.Ct. 1555.

ment so clearly breached its *Brady* obligation to disclose the information reflects the importance attached to it.

The government contends that we are limited to review for plain error, because appellant is challenging the trial court's ruling on grounds that were not asserted at trial. *See, e.g., Watts v. United States,* 971 A.2d 921, 930 (D.C.2009) (citing *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). According to the government, although defense counsel asked the trial court to admit into evidence the government's failure to disclose the exculpatory statements, appellant did not preserve the specific claim he makes on appeal—that he wanted to introduce evidence of the government's withholding of exculpatory evidence to prove admission by conduct. Appellant, on the other hand, argues that his claim was properly preserved, even if not made with the precision of the argument it has presented on appeal, citing *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), and a number of our cases that have applied it. Specifically, appellant contends that by saying "playing dirty" after the judge sustained the government's objection based on relevance, defense counsel let the trial court know (albeit in a short-hand way) that the evidence was relevant because the prosecutor's failure to disclose exculpatory evidence showed that the government knew that its case against appellant was weak. That proposed inference, however, was never fully explained to the trial judge. Nor did defense counsel correct the record when the trial judge commented that there would be "no other sanction" for what the judge perceived to be a clear case where *Brady* required disclosure, when there had

been no sanction imposed on the government (rather, defense counsel had been allowed additional time to prepare). We recognize, however, that it can be awkward for counsel to continue to press when it is apparent that the court did not grasp (perhaps due to counsel's abbreviated explanation) that defense counsel was not seeking a sanction, but arguing for a permissible inference drawn from admissible evidence. As we have noted, the distinction between a new claim on appeal and a new argument presented on appeal in support of a claim that was asserted in the trial court can be difficult to draw; this is such a case. *See, e.g., Anthony v. United States,* 935 A.2d 275, 282 & n. 10 (D.C.2007); *Wilson–Bey v. United States,* 903 A.2d 818, 839 n. 39 (D.C.2006) (en banc), *cert. denied* 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007). We need not decide whether the claim was adequately preserved, however, because, although we conclude that the trial court erred in excluding the evidence and precluding counsel from arguing its relevance to the jury, we conclude also that the error was harmless.

### 1. *Was there error?*

Appellant proffers that if allowed, counsel would have argued that because the government—as the court correctly noted—so clearly breached its obligation to disclose exculpatory evidence until the eve of the second trial, it must have been because it was conscious that a full exposition to the jury would reveal that its case against appellant was weak and needed to be protected from a vigorous defense based on Boyd's initial statement to Officer Woodward at the hospital when he could not identify the person who shot him.[6] Appellant argues that the basis for

---

**6.** To be clear, appellant's argument is not that admission of the evidence and argument

should have been allowed as a sanction against the government, but as substantive

this proposition is already recognized in the law.

In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court observed that "conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* at 446 n. 15, 115 S.Ct. 1555. The Court held that the fact that the government withheld *Brady* material could damage the prosecution's case by creating doubt about "the good faith of the [criminal] investigation." *Id.* at 445, 115 S.Ct. 1555; *cf. Wilson v. United States*, 162 U.S. 613, 621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) ("The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt, to be dealt by the jury."); *see also Farley v. United States* 767 A.2d 225, 241 (D.C.2001) (Ruiz, J., dissenting) (noting that undisclosed "testimony [about unwarranted physically abusive treatment of paraplegic by police during crime investigation], if believed, ... [could] seriously impeach[ ] not only the officers' testimony at trial, but also more broadly, the propriety of the police's conduct of the investigation generally"), *cert. denied* 534 U.S. 982, 122 S.Ct. 415, 151 L.Ed.2d 316 (2001).

We have employed similar reasoning in other settings to permit an inference of a party's consciousness of guilt. In *In re G.H.*, 797 A.2d 679 (D.C.2002), a child neglect proceeding, we held that a fact finder may infer consciousness of guilt from a party's false exculpatory statements. *Id.* at 684 n. 9. Appellant argues by analogy that *In re G.H.* supports his argument that, similar to an inference of consciousness of guilt, an inference that the case is weak can be drawn to impugn the prosecu-

tion when it has resorted to "dirty" tactics by withholding exculpatory evidence it was required to disclose. Indeed, in the civil context, we have accepted that argument. In *District of Columbia v. Perez*, 694 A.2d 882 (D.C.1997), the District government had defended survival and wrongful death actions alleging medical negligence by hospital employees, and, in doing so, presented the patient's clinic records which had been falsified by the attending doctor and nurse (employed by the District of Columbia) after learning of her death. *Id.* at 885 & n. 8. We recognized that the jury could draw an adverse inference against the District based on the misconduct of its agents. *Id.* at 885 n. 8.

Although we have not addressed whether in a criminal trial a prosecutor's breach of duty—here, the withholding of exculpatory evidence—can be used to draw an inference that the prosecutor's action was motivated by the belief that the government's case was weak, as a way of proving that the case was, in fact, weak, the reasoning upon which we relied in *Perez* is equally applicable here:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely*

evidence aiming to present a defense of general denial by showing that the government's

case against appellant was in fact weak.

*though strongly, against the whole mass of alleged facts constituting his cause.* *Id.* (quoting II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed.1979)).

Appellant cites to several opinions from other jurisdictions, which we deem persuasive. In *United States v. Remington,* 191 F.2d 246 (2d Cir.1951), for instance, the court held that "[e]vidence of efforts to suppress testimony or evidence in any form like the spoliation of documents is affirmative defense of the weakness of the prosecution's case." *Id.* at 251.[7] Two early cases predating the *Remington* opinion, one from Massachusetts and another from the Court of Appeals for the Second Circuit, held that "if the district attorney should unfairly suppress evidence he would thereby subject the case of the commonwealth to the same adverse inferences as would result from similar conduct by any other party to a cause." *Commonwealth v. Enwright,* 259 Mass. 152, 156 N.E. 65, 67 (1927). The Second Circuit was even more emphatic:

> If the jury could have been persuaded to believe that the government's representatives in charge of the prosecution had previously tried to convict appellants Graham and McKay by means in part at least of the testimony of Moore which they knew was fabricated, which they, indeed, had aided in fabricating, and were still trying to do so even after Moore had recanted, the basis would have been laid for the same presumption against the government that arises

against persons who fabricate, suppress or destroy testimony. Omnia praesumuntur contra spoliatorem.[8] The jury would then have had reason enough for concluding that the prosecutor was conscious that his case against the appellants was lacking in merit and that they were innocent men unjustly accused.

*United States v. Graham,* 102 F.2d 436, 442 (2d Cir.1939).

Similarly, in *United States v. Boyd,* the Seventh Circuit held that:

> [t]he gravity of the prosecutors' misconduct ... may support ... an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that *without such tactics the defendants might be acquitted.* If the prosecutors did not think their case airtight (and so they tried to bolster it improperly), *this is some indication that it was indeed not airtight.*

55 F.3d 239, 241–42 (7th Cir.1995) (emphasis added) (citations omitted).[9]

The Tennessee Court of Criminal Appeals has stated:

> On the issue of the alleged spoliation of the State's diagram of the scene, the record shows that sometime after one of the eyewitnesses had begun testifying at the original trial of this case, a mistrial was ordered on the defendant's motion. In preparation for the retrial, the prosecutor erased certain marks put on the diagram by the eyewitness indicating the location of various people who were inside the house at the time. The defen-

---

**7.** In *Remington,* the court distinguished between the probative value to the defense of efforts to suppress evidence, and any disciplinary sanction that might result from the misconduct. *Remington,* 191 F.2d at 251. We do so here as well. See note 15, *supra.*

**8.** "All things are presumed against a wrongdoer." *Graham,* 102 F.2d at 442.

**9.** In *Boyd,* the prosecution had knowingly used perjured testimony and failed to disclose the "stream of unlawful, indeed scandalous, favors from the staff at the U.S. Attorney's office [to the witnesses] while [they were] jailed...." 55 F.3d at 241, 244.

dant insists that this deliberate erasure had the effect of depriving him of effective cross-examination in the subsequent trial and that it constitutes *"affirmative evidence of the weakness of the prosecution"* under *United States v. Remington* and similar cases. This latter conclusion is correct as a matter of law, provided the circumstances of the act manifest bad faith on the part of the prosecution. *Williams v. State,* 542 S.W.2d 827, 831 (Tenn.Crim.App.1976) (emphasis added) (citation omitted).

We are persuaded by the analysis in the cases we have discussed and conclude that defense counsel had a basis in law to argue that the government's nondisclosure of exculpatory information was akin to an admission by conduct that the government was conscious that its case was weak (and that it was in fact weak) and that appellant should have been allowed to present that evidence. The reasonableness and strength of the inference necessarily depend on the extent or gravity of the misconduct. On the record we have, we see no reason to disagree with the trial court's assessment that the evidence should have been disclosed, as the prosecutor in the second trial recognized. See note 14, *supra.* As the trial court stated, it is difficult to "see how any prosecutor anywhere in any state in the country," could think otherwise. Thus, to preclude the defense from presenting evidence of the government's deliberate nondisclosure to the jury was legal error.